MARY J. BURNHAM *vs.* COLLATERAL LOAN COMPANY.

Suffolk.    March 6, 1901. — June 17, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Malicious Prosecution.    False Imprisonment.*

One who, believing that a crime has been committed, sends for a police inspector and fairly and truthfully discloses to him all matters within the speaker's knowledge which he supposes to have a material bearing upon the question of the innocence or guilt of the person suspected, and leaves it to the officer to act upon his own judgment and responsibility as to whether or not there shall be a criminal prosecution, and does no more, cannot be held answerable in an action for malicious prosecution, in case the officer comes to the wrong conclusion and prosecutes when he ought not to do so. It makes no difference that the person who sends for the officer and gives him the information is in the habit of doing this in similar cases.

In an action against a pawnbroker for alleged malicious prosecution and causing
the unlawful arrest of the plaintiff, it appeared, that the plaintiff represented
herself to the defendant as the owner of certain articles which she pledged to
him, whereas she held them under a contract of conditional sale, the title being
in the vendor, and that the defendant learning of the facts called in a police
inspector and informed him of them. The plaintiff offered to show that the de-
fendant held other property of hers more than sufficient to cover all loans which
the defendant had made to her and which he had a right to apply to the pay-
ment of the loans, and that the defendant did not investigate and report to the
officer the state of the general account between him and the plaintiff. *Held,* that
the evidence properly was excluded as immaterial, having no bearing whatever
upon the pledging of the property of another which was the only thing that the
defendant was reporting to the officer. *Held, also,* that evidence to show an offer
of the plaintiff to pay the defendant after her discharge from arrest was like-
wise immaterial, as also was evidence that the plaintiff gave the pawn ticket to
the owner of the pledged articles and had no intention of committing a fraud,
neither of these facts being known to the defendant at the time he called in the
officer.

TORT against a loan company for malicious prosecution of the
plaintiff and causing her arrest and imprisonment on a charge of
selling and conveying, with intent to defraud, personal property
in her possession under a written conditional contract of sale.
Writ dated May 11, 1898.

At the trial in the Superior Court, before *Maynard, J.*, it
appeared, that the plaintiff was arrested by one Glidden, a
police officer, on March 21, 1898, and brought before the Mu-
nicipal Court of the city of Boston for trial, on a complaint by
him under Pub. Sts. c. 203, § 74, for selling and conveying to
the defendant, with intent to defraud, two diamond earrings,
which, it was alleged, had been bought of one Ginsberg on a
written conditional contract of sale; that on March 29, 1898,
the case was tried in the Municipal Court, and the judge found
the plaintiff not guilty and ordered her discharge.

There was evidence tending to show that the plaintiff on No-
vember 3, 1897, bought of one Ginsberg, under a written condi-
tional contract of sale, a pair of diamond earrings for the sum of
$185; that on that day she paid the sum of $25 down, and agreed
to pay a certain sum each week until the whole was paid, and
took possession of the earrings; that on the next day, November 4,
1897, she pledged the earrings to the defendant for the sum of
$80, and received from the defendant its ticket numbered 21,805;
that on or about March 18, 1898, Ginsberg exhibited to the de-
fendant the conditional contract of sale above mentioned, and

the ticket of the defendant issued to the plaintiff, and stated that the articles so pledged were his, and demanded them as his property ; that the conditional contract of sale had upon it indorsements showing payments by the plaintiff on account to the amount of $22 in addition to the $25 paid on November 3, making the payments in all $47, and that no payments had been made since January 29 ; that thereupon the defendant, through its president or its cashier, sent to the board of police in the city of Boston for a police inspector ; that it was their custom to do so in cases of this kind, and that the officer after receiving from the defendant a statement of the facts proceeded in his own way to get the information needed, and from that time until after the plaintiff was discharged in the lower court the president or cashier did not see the officer again in regard to this matter.

One Cobb testified, that he was president of the defendant at the time of testifying and had been president for a term of ten years, and was president at the time of the transactions between the defendant and the plaintiff ; that he sent to the police headquarters at Pemberton Square for a police inspector; that an officer came to his office ; that he submitted to him the facts, which he usually did in a case of that kind ; that he showed him what he believed to be a fraud ; that the officer knew his duty and did it; that he did not give the officer the plaintiff's address, but supposed that he procured it; that he did not inquire where the plaintiff lived, and did not know how the officer obtained her address ; that he had a clerk in the office named Reed ; that he sent for the police officer to show a transaction that seemed to be wrong and a fraud. " *Q.* Can you give me the substance of what you said? *A.* I cannot; it is a thing that occurs four or five times a month in our office, — this matter. I don't know. It is a thing that is so clearly understood by the officer when he comes and sees these facts. — *Q.* That he comes to make an arrest? *A.* He does not make the arrest until he makes the inquiry. He gets the facts from us, and then goes and pursues the investigation. I don't decide. I don't instruct the officer what to do." The defendant further testified, that his cashier, one Moore, gave the officer the statement of facts ; that he was present at the time ; that he did not see the officer again until the officer reported to him the result of that case.

The plaintiff offered to prove by Cobb that at the time she was arrested the defendant had in its possession other property of hers more than sufficient to cover all loans which it had made her, and which it had a right to take under the various contracts with her.  The defendant objected to the admissibility of the evidence, the judge sustained the objection, and the plaintiff excepted.

On cross-examination Cobb testified, that before talking with the police officer, or at the time he talked with the officer, or after talking with the officer, he did not make an investigation to find out what the status of the account between the defendant and the plaintiff was.  " *Q.* Did you at any time before sending for the police officers, investigate yourself, or by any agent of yours, to determine the state of the account between your concern and the plaintiff ? "  This question was objected to by the counsel for the defendant, and was excluded by the judge as immaterial, and the plaintiff excepted.  The plaintiff offered this evidence for the purpose of showing that the defendant did not properly and fairly investigate the charge.

The plaintiff offered to show by Cobb that on April 29, 1898, she offered to pay the defendant all the money that was due it from her, and that the defendant refused to receive the amount which it had loaned her on account of the diamond earrings. The judge excluded the evidence, and the plaintiff excepted.

On re-direct examination Cobb testified, that when Ginsberg showed him the contract, it did not occur to him to send for the plaintiff; that he did not inquire of Ginsberg at that time what arrangement the plaintiff had made with Ginsberg in reference to the earrings ; that he did not recollect any conversation he had had in reference to how Ginsberg happened to have the pawn ticket in his possession when he talked with the witness ; that he did not think it strange that he had the pawn ticket; that it was a common thing for a party to surrender the pawn ticket to avoid trouble.

The plaintiff testified, and was asked by her counsel in direct examination : " *Q.* When you obtained this money from the Collateral Loan Company, did you intend to defraud them ? "  The defendant objected and the judge excluded the question ; to which the plaintiff excepted.

The plaintiff testified, that she gave Ginsberg the pawn ticket in question. This evidence, however, the judge ordered to be stricken out, and the plaintiff excepted.

The plaintiff further testified, that in March, 1898, two police officers came to the house where she lived quite early in the morning, one of them being Glidden. She was then asked the question : " Will you tell the jury just what they did there ? " This was objected to by the counsel for the defendant, and the judge ruled that it was not admissible at that time, saying " I shall exclude this evidence at the present time, and, if you show further evidence that satisfies me you have a right to go to the jury on that question (the instigation of the prosecution of the plaintiff by this defendant), I will allow you to interrogate her further." This evidence was not again offered because the judge, after hearing other evidence, ruled that the plaintiff had not shown that the defendant had authorized the arrest.

Glidden testified, that he was a police inspector in the city of Boston ; that he went to the defendant's office in March, 1898 ; that he got word from some source that they wanted to see him ; that he did not remember whether it was a message, or a note, or how ; that when he got there he saw Moore and Cobb, and the usual army of clerks ; that he did not know what was wanted of him before he got there ; that one of them gave him a memorandum on a piece of paper of the name of the plaintiff, and of a loan of $80 on some earrings, and the dates ; that they told him that they had been claimed by a man by the name of Ginsberg, who had exhibited a lease, and asked him to investigate the matter ; that he had a conversation with Ginsberg, and after he saw him he did not think he went back to the defendant's office. " I have prosecuted several of these cases, quite a number of them ; and it was a kind of an understanding that if they sent for me, and produced a memorandum with the name, date, amount loaned and article, telling me that it was claimed that they were leased goods, that I should investigate and so go ahead and prosecute them, if I thought there was a case " ; that he had this understanding with them for a good while, so that each time they would not have to repeat it ; that he had prosecuted quite a number of such cases before for the defendant ; that they did not give him the pawn tickets or contract ; that he got the con-

tract from Ginsberg. ." Q. You understood they had left it with you? A. Yes, sir. — Q. To go ahead if you thought there was a case? A. That is right."

Moore testified, that he remembered the matter of these two diamonds; that he was present at the time officer Glidden came; that he and Cobb talked together about sending for him; that they talked over the fact that under the circumstances they ought to lay it before the officer; that he and Cobb both talked with the officer; that they gave Glidden the facts of the case as they understood it at the time about the diamonds being pledged there by the plaintiff on the fourth of November, 1897, and that Ginsberg had stated that he leased them to her on the third of November, and asked him to investigate the case and attend to it; and that Glidden said he would attend to it. " Q. Was he to make any further report to you before doing anything? A. No, sir." That neither Cobb nor himself told Glidden when he came that they had had other transactions with the plaintiff.

At the close of the evidence, the judge ordered the jury to return a verdict for the defendant; and the plaintiff alleged exceptions.

The case was argued at the bar for the defendant in March, 1901, the plaintiff submitting a brief, and afterwards was submitted on briefs to all the justices.

*W. H. Baker*, for the plaintiff.

*W. C. Wait*, for the defendant.

HAMMOND, J. The defendant's officers, believing that a crime had been committed, sent to the police headquarters for a police inspector. In compliance with the request, Glidden, an inspector, came to the office of the defendant, whose officers stated to him the facts so far as material. There is no evidence which would warrant a finding that they said to him anything which was false, or concealed from him any material fact which was true, or that they directed the officer to begin a prosecution. Everything was left to him. They expected, and so did he, that he would make further investigation; that if in the end he determined that the case should be prosecuted, he would act accordingly; and that in all this he would act not as the agent and in behalf of the company, but as a public officer, charged with the duty of detecting crime and of prosecuting according to law

those accused of it. It is true that the officer testified, that he had prosecuted quite a number of cases before for the defendant, but the language, taken in connection with the context, cannot be fairly interpreted to mean that he in those cases acted as the agent of the company or in any way under its direction or influence.

The officer in the end was to act upon his own judgment in this case. He did act upon it; therefore the complaint was not made by him as the agent of the company, and the defendant cannot be held upon the ground that it made the complaint. Nor is the connection of the defendant with the case in any way such as to show that it can be held responsible for the decision of the officer. It is true that they gave him information upon which he relied and by which he may be presumed to have been influenced in his conclusion to prosecute, but that is not of itself sufficient. The principles governing the rights and liabilities of the parties to an action for malicious prosecution are the result of a compromise between the right of the individual to be free from arrest or prosecution upon a charge of which he is innocent and the right of the community to be protected from crime. And one of these principles is that if a person discloses fairly and truthfully to the officer, whose duty it is to detect crime, all matters within his knowledge which, as a man of ordinary intelligence, he is bound to suppose would have a material bearing upon the question of the innocence or guilt of the person suspected, and leaves it to the officer to act entirely upon his own judgment and responsibility as a public officer, as to whether or not there shall be a criminal prosecution, and does no more, he cannot be held answerable in an action for malicious prosecution, even if the officer comes to the wrong conclusion and prosecutes when he ought not to do so. Such a person does no more than his duty; and to hold him answerable in an action for malicious prosecution for the result of the mistake or misconduct of the officer would be to make the division line of compromise between the right of the individual to his liberty and the right of the public to protection trench too far upon the domain of the latter. *Monaghan* v. *Cox,* 155 Mass. 487. *Smith* v. *Austin,* 49 Mich. 286. *Lark* v. *Bande,* 4 Mo. App. 186. See also *Dixon* v. *New England Railroad, ante,* 242. Nor does it make any difference that a person does this in many cases.

Tested by this principle, the plaintiff failed to make out a case, and a verdict was rightly ordered for the defendant.

We see no error in the exclusion of evidence. The offence for which the plaintiff was tried, and of which she was acquitted, was that she, being in possession of personal property, to wit, two earrings received upon a certain written and conditional contract of sale, with intent to defraud, sold and conveyed the same to the defendant. There was no question that she did pawn the earrings thus held by her to the defendant, and received from it the sum of $80; and that in that transaction she in substance represented herself and was understood by the defendant to be, the owner of the earrings, and that the loan was made upon them and upon nothing else, and all parties knew this. Such a transaction was a fraud both upon the defendant and Ginsberg the real owner of the earrings, and upon the question of the plaintiff's guilt we think the facts that the defendant held property of hers more than sufficient to cover all loans which they had made to her and which they had a right to take under the various contracts with her, and that the defendant did not investigate and report to the officer the state of the general account between it and her, were immaterial. They had no bearing whatever upon the nature of the transaction about the earrings, which was the only thing the defendant's officers were submitting to the police inspector. The offer of the plaintiff to pay the defendant was made after her discharge, and therefore was of no consequence. And we do not see how the defendant could be held answerable for not informing the officer that the plaintiff gave to Ginsberg the pawn ticket and that she had no intention of committing a fraud, because neither of such facts was known to the defendant at the time it called in the officer. The circumstances occurring at the time of the arrest affected only the question of damages, and, there being no liability, evidence as to them becomes of course immaterial.

The result is that there appears no error in the rulings as to evidence, and that there is no ground upon which the defendant can be held answerable to the plaintiff for the prosecution of which she complains.

*Exceptions overruled.*