THOMAS H. GRIFFIN, JR., *vs.* EDWARD D. DEARBORN.

Essex.    November 8, 1911. — November 29, 1911.

Present: RUGG, C. J., HAMMOND, BRALEY, SHELDON, & DECOURCY, JJ.

*Malicious Prosecution.*

In an action by a boy for malicious prosecution in causing the arrest of the plaintiff upon a charge of larceny of a horse, if on the evidence it can be found that the horse was taken from the defendant's stable by the plaintiff's younger brother, who was acting under an honest claim of right in obedience to an order which he believed to have been given to him rightfully by his father, that the defendant ought to have known that this was so and to have seen that, if any crime was committed, the father and not the son was the guilty person, and that the defendant, without making any investigation of the grounds on which the boy who took the horse was acting, believing the plaintiff to be such boy, caused his immediate prosecution on a charge of larceny, and if the defendant on his cross-examination testifies that he wanted his horse or an equivalent and that he wanted the horse and would have taken money, there is evidence for the jury that the defendant was actuated by malice and that he acted without any honest or well grounded belief that the person whom he intended to prosecute was guilty of the alleged crime.

If, at the trial of an action for malicious prosecution, the presiding judge instructs the jury that if they find that the defendant instituted the prosecution of the plaintiff from malice they should return a verdict for the plaintiff, without also plainly instructing them that the plaintiff cannot recover unless the absence of probable cause for the prosecution also is shown, and thereupon the jury return a verdict for the plaintiff, an exception by the defendant will be sustained, because the jury may have returned their verdict for the plaintiff on the ground of the defendant's malice alone without finding the absence of probable cause.

---

TORT for malicious prosecution. Writ dated April 21, 1906.

In the Superior Court the case was tried before *Pierce*, J. The plaintiff, who was a minor, brought the action through his father and next friend. It was admitted at the trial that the defendant on April 1, 1906, swore out in the Lynn Police Court a complaint charging the plaintiff with the larceny of a horse valued at $100; that on the following day, which was Monday, the plaintiff, who had been arrested upon the warrant issued upon the complaint, appeared in the Lynn Police Court, and at the request of counsel representing the defendant the case was continued until the following Thursday, when the plaintiff again appeared and upon the request of the defendant's counsel, who stated to the court that there was no evidence to warrant a conviction, was discharged.

On cross-examination the plaintiff testified that he was employed by his father, Thomas H. Griffin, as a helper in his blacksmith shop and had been so employed for a number of years; that he had a younger brother employed in the same shop and that this brother's duty was to go to get horses belonging to patrons of the shop who desired to have their horses shod, and to take them back to the owners after the shoeing had been done; that such employment was commonly known in the horse shoeing trade as "riding out the horses," and that this term was commonly used and recognized in the trade as describing the employment in which his brother was engaged. The plaintiff testified further that on the day preceding his arrest his father and the defendant had swapped horses; that the arrangements for the swap had been made at or near the shop; that he was present at the time; that the defendant went away after the terms of the swap had been arranged, telling the plaintiff's father to send the horse he had formerly owned to the defendant's barn and get from the defendant's wife a check representing the amount the defendant was to pay for the difference in value between the two horses and take away the horse which the defendant had owned; that this was done, the plaintiff's brother being sent to effect the exchange; that a little later the plaintiff was present when there was a conversation between his father and his brother, as a result of which the brother was sent for the second time to the defendant's barn, to re-exchange the horses; that he did not know

whether or not his father had seen the defendant or had any conversation with him previous to this re-exchange.

John McKenna, a witness for the defendant, testified that he was employed by the defendant as a teamster; that he was present when the plaintiff's brother brought the horse his father had owned to the defendant's barn and took the defendant's horse away; that later in the afternoon the same boy came back riding the horse which the defendant had previously owned and said to the witness, "There has been a mistake, my father and Mr. Dearborn [the defendant] have traded back and I have come to get our horse;" that the witness told the boy he could not take the horse until the witness had communicated with the defendant; that while the witness was in the house trying to get the defendant by telephone, the boy backed the horse which the defendant had received in exchange from Griffin, senior, out of the stall in the barn and was on its back when the witness came out of the house; that, when the witness attempted to stop him, the boy struck the horse with the halter and rode away; that the defendant returned later in the afternoon; that the witness told him that the horse had been taken away and in reply to Dearborn's question as to who took it, said, "It was Griffin's boy, the one who rides out the horses down at the shop."

The defendant testified that he had swapped horses on the afternoon of Saturday, March 31, with Thomas H. Griffin, the father of the plaintiff; that after the arrangements for the swap were made he instructed Griffin to send to the defendant's barn and make the exchange; that he did not agree afterwards to swap back, had no conversation again that day with Griffin, and did not see him again that day; that when he returned to his home in the afternoon he learned from McKenna that the horse he had received in exchange from the plaintiff's father had been taken from his barn; that McKenna told him that the boy who took the horse had made the statement that his father and the defendant had swapped back and that the boy had ridden the horse away in spite of McKenna's protest and opposition; that in answer to his question as to who it was who took the horse, McKenna replied, "It was Tom Griffin's boy, the one who rides out the horses down at the blacksmith shop;" that he did not himself know that Griffin had more than one son employed

at the blacksmith shop; that he then reported what had occurred at the police headquarters, which were situated across the road diagonally from Griffin's blacksmith shop; that on the following morning, which was Sunday, he went to police headquarters and talked with the deputy chief of police; that he told this official that he did not know the name of the boy who took the horse but it was the boy who "rode out the horses" at Griffin's blacksmith shop across the street; that the deputy chief directed him to the clerk of the Lynn Police Court, whose office was on the floor next above in the same building and that he sent an officer with the witness to the clerk's office; that in the presence of this officer he told the clerk that the horse had been taken from his barn; that he had given no authority for it being so taken. The clerk then asked him if he knew the name of the boy who took the horse and that he answered that he did not, but it was Griffin's son who rode out the horses from the blacksmith shop; that thereupon the officer who had accompanied him to the clerk's office said, "I know him, his name is Thomas;" that the clerk then filled out a complaint and handed it to the witness and asked the witness whether that was right and the witness said he supposed so, and signed his name and swore to it; that all of the complaint except his signature was filled in by the clerk; that on the Monday morning following the plaintiff's arrest the witness was sick in bed and unable to attend court; that he instructed his counsel to ask the court for a continuance of the proceedings till the following Thursday; that on Thursday he was at the court with the witness McKenna, prepared to testify for the prosecution; that McKenna after seeing the plaintiff in the court room said to the witness that there had been a mistake and the wrong boy had been arrested, as the plaintiff, the then defendant, was not the boy who took his horse, but his brother; that that was the first intimation the witness had received that any mistake had been made or that Thomas Griffin, senior, had two sons employed at the blacksmith shop; that the witness immediately instructed his counsel to ask the court for the plaintiff's discharge on the ground that there was no evidence to convict him, and that this was done.

The defendant was cross-examined as follows: " Q. You knew it was a serious thing to arrest a young man on a charge of lar-

ceny? A. I don't know that I asked anybody to arrest anybody. — Q. What were you going to do? A. I left it to them. — Q. You wanted them to if you didn't get the horse back promptly? A. Yes, sir. — Q. That is, it was either the horse or the body of the boy? A. Well, the horse or an equivalent. — Q. Or the boy? A. I wanted the horse. — Q. The horse, the money or the boy? A. No; I wanted the horse and would have taken the money."

The defendant, among other requests, asked the judge to instruct the jury as follows:

"10. That if the jury find that the defendant in this action acted under the advice of counsel or an attorney at law, in instituting the prosecution against the plaintiff, in the Lynn Police Court, then your judgment must be for the defendant.

"11. That the evidence offered by the plaintiff in this case fails to show lack of probable cause on the part of the defendant in instituting the prosecution complained of.

"12. Upon all the evidence in this case your verdict must be for the defendant."

The judge refused to give these instructions. The portion of the judge's charge which is material to the exceptions is described in the opinion.

The jury returned a verdict for the plaintiff in the sum of $100; and the defendant alleged exceptions.

*F. E. Shaw,* for the defendant.

*J. W. Sullivan,* for the plaintiff.

SHELDON, J. The plaintiff had the burden of showing that the prosecution against him was instigated by the defendant both maliciously and without probable cause. The jury could have inferred the existence of malice from the absence of probable cause; but the latter must be affirmatively shown and cannot be inferred from the existence - of malice. *Parker* v. *Farley,* 10 Cush. 279, 281. *Stone* v. *Crocker,* 24 Pick. 81, 84. *Wilder* v. *Holden,* 24 Pick. 8, 11. These fundamental principles are not disputed; but the defendant contends that there was not sufficient evidence to hold him and that the jury were not properly instructed at the trial.

1. There was evidence for the jury of the absence of probable cause. This issue becomes a question of law for the court only

when the facts bearing upon it are not in dispute. *Casavan* v. *Sage*, 201 Mass. 547. That was not the case here. The circumstances of the alleged larceny, as it is contended that they were reported to the defendant, did not exclude the hypothesis that the plaintiff's younger brother, in taking the horse from the defendant's stable, was acting under an honest claim of right in obedience to an order which he believed to have been rightfully given to him by his father. The jury could find, not only that this was the case, but that the defendant ought to have known it to be so, and to have seen that if the crime had been committed at all it was the father and not the son who was the guilty person. The defendant's immediate prosecution of the son without any precedent investigation of the grounds or reasons on which the latter had acted might be taken to indicate both that the defendant was actuated by malice and that he acted without any honest or well grounded belief that the person whom he intended to prosecute was guilty of the alleged crime. The defendant's own testimony on cross-examination could be found to support this view, — that he wanted the horse or an equivalent, that he wanted the horse and would have taken the money. The issues were for the jury.

2. The tenth request was properly refused. There was no evidence that the defendant had acted under the advice of counsel. It could be found that he did not honestly state all the facts that had come to his knowledge either to the deputy chief of police or to the clerk of the police court, and did not leave it to them to act on their own judgment and responsibility, and that neither of them advised him to make a criminal prosecution. On these findings, the case of *Burnham* v. *Collateral Loan Co.* 179 Mass. 268, gives him no comfort.

3. But we are apprehensive that the jury may have been misled by what was said in the charge to the jury. After giving instructions both as to probable cause and as to malice, and after having told the jury that the law would not protect the defendant if he had acted, though not from " black-hearted revenge," yet from " the desire to accomplish something . . . based upon sinister and bad motives and reasons," the judge said to them : " What was the motive which actuated him? . . . Was it love of justice? Was it love of self? If it was for justice on the facts of

this case there ought to be a verdict for the defendant. If it was love of self and he set this in motion because he had a bad and wicked heart toward people in general situated as this boy was, there should be a verdict for the plaintiff." This was a clear and plain direction to find for the plaintiff if the jury should find that the defendant had instituted the prosecution from malice. It is the winding up of the instructions upon the question of liability, and it had not been preceded by any equally clear and distinct statement that the plaintiff could not recover unless the absence of probable cause also was shown. As there was conflicting evidence, it may be that the jury rested their verdict entirely upon a finding of malice and either did not pass upon the issue of probable cause or found that question in favor of the defendant. Accordingly there must be a new trial.

We have not deemed it necessary to discuss most of the defendant's requests for instructions because they have not been specifically argued. What has been said covers all the material contentions that have been made. We find no other error than what has been stated.

*Exceptions sustained.*