MARY R. CARROLL vs. JAMES J. GILLESPIE & another.[1]

Plymouth. January 21, 1982. — June 14, 1982.

Present: GOODMAN, CUTTER, & GREANEY, JJ.

*Malicious Prosecution. Probable Cause. Abuse of Process.*

At the trial of a complaint seeking damages for malicious prosecution, evidence warranted a finding that, when the defendant caused the plaintiff to be arrested for having forged an endorsement on a check, he did not have probable cause to believe that it was the plaintiff who had endorsed the check. [18-26]

In an action seeking recovery for abuse of process, evidence that the defendant caused the plaintiff to be arrested for having forged an endorsement on a check without having probable cause to believe that it was the plaintiff who had endorsed the check, and that the defendant caused the plaintiff to be arrested because he wanted to collect payment from the plaintiff for repair of an automobile, warranted a finding that the defendant was seeking to use the criminal process to collect a civil debt. [26]

CIVIL ACTION commenced in the Superior Court on November 10, 1976.

The case was tried before *Pierce, J.*

*Robert F. Murphy* for the defendants.

*Joseph A. D'Agostino* for the plaintiff.

GREANEY, J. The plaintiff brought this action to recover damages from the defendants James J. Gillespie (Gillespie) and Gillespie Ford Sales, Inc. (dealership) on six separate theories, including malicious prosecution, abuse of process and slander. At trial in the Superior Court, the defendants filed motions for directed verdicts, Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974), which were denied as to the three

---

[1] Gillespie Ford Sales, Inc.

claims above.[2]  The issues were then submitted to the jury by way of special questions. Mass.R.Civ.P. 49(a), 365 Mass. 812-813 (1974). In answer to those questions, the jury found for the plaintiff on the claims for malicious prosecution and abuse of process, and assessed damages in the amount of $7,500 on each claim. The jury found for the defendants on the claim for slander. Judgment was entered on the verdicts in the amount of $15,000, and the defendants appealed.[3] The issue presented is whether the defendants' motions for directed verdicts on the claims for malicious prosecution and abuse of process were properly denied. We hold that they were.

The evidence presented at trial leaves material facts in dispute. See note 10, *infra.* We therefore view the evidence in the light most favorable to the plaintiff. *Willis* v. *Gurry,* 331 Mass. 19, 20, 21-22 (1954). *Quaranto* v. *Silverman,* 345 Mass. 423, 424 (1963). *Smith* v. *Eliot Sav. Bank,* 355 Mass. 543, 545 (1969). *Seelig* v. *Harvard Coop. Soc.,* 1 Mass. App. Ct. 341, 343-344 (1973). So viewing the evidence, the jury could have found the following facts.

The plaintiff lived with one Frank Carroll in a house which they owned in Marshfield. During the period in issue, Carroll was working in Alliance, Ohio, and the plaintiff made several trips between Marshfield and Alliance, living for various periods in each place. In December, 1975,

---

[2] The motions were allowed as to the plaintiff's additional claims. Verdicts were directed at the close of the plaintiff's case on a claim for false imprisonment, and at the close of all the evidence on claims for libel and intentional infliction of emotional distress. The plaintiff does not challenge the propriety of these rulings on appeal.

[3] The defendants have not argued that the award of damages for both malicious prosecution and abuse of process constitutes an impermissible double recovery in these circumstances. See and compare *Darmetko* v. *Boston Housing Authy.,* 378 Mass. 758, 761-763 (1979); *Simon* v. *Solomon,* 385 Mass. 91, 107-111 (1982). Cf. *McGrath* v. *Mishara,* 386 Mass. 74, 83-87 (1982). Accordingly, we do not consider that issue, and express no opinion as to its merits. Mass.R.A.P. 16(a) (4), as amended, 367 Mass. 921 (1975); *Barclay* v. *DeVeau,* 384 Mass. 676, 682 n.14 (1981) . We note, however, that the judge's charge on damages is not included in the appendix.

while in Marshfield, the plaintiff damaged Carroll's car in an accident, and it was taken to be repaired at Gillespie Ford. Due to a mistake, however, the dealership's form order for the repairs was made out in the name of "Fran" (rather than Frank) Carroll.[4]

Several weeks later, lacking local transportation, the plaintiff joined Carroll in Ohio. She remained there for several months, apparently due in part to the fact that the insurance coverage for the repairs was disputed, and ultimately denied. In the last week of March, 1976, the plaintiff returned to Marshfield, and Carroll sent her the funds necessary to pay for the repairs. The funds were sent in the form of a certified check for $1,500, drawn by Carroll on the First National City Bank of Alliance, Ohio. The check, however, was payable not to the dealership, but to "Mrs. Mary Carroll."

On April 1, 1976, the plaintiff went to the dealership to pick up the car. In payment for the repairs, the plaintiff gave the certified check to the dealership's cashier. The bill totalled $1,425.65, and the cashier returned $74.35 in change. By inadvertence, however, the plaintiff had failed to endorse the check, and the cashier failed to notice that there was no signature on the back. Several days later, the plaintiff left Marshfield and rejoined Carroll in Ohio.[5]

On April 2, 1976, the dealership deposited the check to its account with the Lincoln Trust Company in Marshfield.

---

[4] The plaintiff testified, without contradiction, that she informed an employee of the dealership that the car was owned by Frank Carroll. In addition, both the repair order and a subsequent written estimate were introduced in evidence, and the jury could have found that the name on those forms was filled out in the same handwriting as the repairs which they itemize. Cf. *Priorelli* v. *Guidi*, 251 Mass. 449, 450 (1925); *Buker* v. *Melanson*, 8 Mass. App. Ct. 325, 330 (1979). Based on this evidence, the jury could properly have concluded that the name "Fran" Carroll was listed on the repair order by mistake, and that the mistake was made by the employee of the dealership who filled out the form.

[5] The plaintiff did not take the car with her to Ohio. Upon driving it home from the dealership, she found that it was not in proper working condition, and the car was returned to the dealership the following day.

On April 12, 1976, the bank returned the check to the dealership with a stamped notation that it lacked the endorsement of the payee. The dealership received the check by April 13, 1976. On April 14, 1976, the dealership redeposited the check. At that time, a signature appeared on the back in the name of "Mrs. Mary Carroll."

On June 16, 1976, the Ohio bank which issued the check asked the plaintiff in Alliance to examine the endorsement. She did so, and stated that the signature was not hers. At the request of the bank, she then signed a form affidavit which stated that she had not endorsed the check nor authorized anyone else to do so; that she had not received any proceeds or benefit from the check; and that the signature of endorsement was a forgery. The Ohio bank then returned the check to the Lincoln Trust Company. On June 24, 1976, Lincoln Trust informed Gillespie by letter that there had been an "alleged forgery of endorsement," and returned the check along with a copy of the plaintiff's affidavit.

On June 25, 1976, Gillespie went to the Plymouth District Court and met with Sergeant Andrew P. Gerard, a Marshfield police officer and the town prosecutor. From the officer's testimony at trial, and his original written report, the account of that meeting most favorable to the plaintiff appears as follows. Gillespie showed the officer the check, the affidavit, and the bank's letter, and told him that he had received a bad check for car repairs from a woman who identified herself as Fran Carroll. Specifically, Gillespie represented that the endorsement on the check had been forged, that "Mrs. Carroll was the person that forged it," and that she had done so "in the . . . [dealership] office." He also stated that his son had seen a "for sale" sign on her house, that she was "about to leave for Ohio with the motor vehicle" which the dealership had repaired, and that she also used the name Romanski.[6] Gillespie further told the

---

[6] The plaintiff's legal name was Mary Romanski. She testified, however, that she considered Frank Carroll her common law husband, and that she had conducted all of her business, and maintained all of her iden-

officer that "he wanted his money for the check" and that "he wanted the police to arrest" the plaintiff.

Officer Gerard advised Gillespie, according to "standard policy," that the acts which he alleged amounted to felonies, that these were serious charges, and that they were likely to lead to the plaintiff's arrest. He further informed Gillespie that the police department was "not concerned with the restitution of his monies . . . [but with] criminal acts," and that it was "not a collection agency." Gillespie acknowledged that he understood the seriousness of his charges, including the possibility that the plaintiff would be arrested. The officer proceeded to confirm that there was a "for sale" sign on the plaintiff's house and that no one was at home. He then applied for complaints charging the plaintiff with forgery, uttering a false instrument, and larceny by false pretense.[7] The complaints issued that same day, along with three warrants for the plaintiff's arrest.

On or about August 13, 1976, the plaintiff returned to Marshfield. Gillespie apparently learned of her return. On August 16, 1976, he called the Marshfield police and told them that she was at home. That evening, two officers went to the plaintiff's home and arrested her. She was placed in the back of the cruiser, taken to the police station, and booked on the outstanding charges. The plaintiff spent that night in jail. She was arraigned the following morning, and then released on bail pending trial.

At the arraignment, the judge asked Officer Gerard to inquire of Gillespie whether he could provide a witness at trial who actually saw the plaintiff sign the check. The officer did so that afternoon, and Gillespie said that he could. At trial on October 19, 1976, Gillespie failed to appear but sent the dealership's cashier, one Joseph Comich, as a witness. Comich testified that he had accepted the check, but could not recall whether he saw the plaintiff endorse it, or whether

tification, in the name of Mary Carroll since she began living with Frank in 1973. She also testified that she had never used the name Fran Carroll.

[7] See respectively G. L. c. 267, § 1; G. L. c. 267, § 5; G. L. c. 266, § 30.

it was endorsed when he received it. Officer Gerard attempted to consult Gillespie but was told that he could add nothing to the cashier's testimony. Following trial, the plaintiff was acquitted on all three charges.

At the trial of the present action Gillespie was called by the plaintiff. He admitted that when he met with Officer Gerard on June 25, 1976, he did not know who had endorsed the check, and that he currently had "no idea" whether it was the plaintiff who signed it. Gillespie denied telling the officer that the check was signed in the dealership office. At trial, his testimony was that he (Gillespie) "was told" that sometime between April 12 and April 14, 1976, an employee of the dealership went to the plaintiff's house with the check and gave it to Carroll, who took it inside, and returned it bearing an endorsement. On cross-examination, however, he testified that this employee did not see the plaintiff at the house; that the employee did not see who signed the check; and further, that none of the dealership's employees saw the signing of the check at any time.

Gillespie admitted telling Officer Gerard that "I wanted to collect my money," and admitted that this was, in fact, his purpose.[8] He denied telling the officer that he wanted the plaintiff arrested, but conceded that he probably said that he "wanted her brought into court." In general, Gil-

---

[8] On this point, Gillespie's testimony was as follows:

"Q. You intended that . . . [the plaintiff] should be tried on these charges, did you not?

. . . .

A. Unless my money was secured before then, sir.

Q. Isn't it true, Mr. Gillespie, [that] what you really wanted out of this was to collect your money?

A. In essence, yes, sir.

. . . .

Q. Mr. Gillespie, isn't this what you wanted, you wanted your money?

A. Yes, sir. Very simple, I wanted my money, sir."

lespie took the position that he left the matter "in the inca-pable [*sic*] hands of Sergeant Gerard."[9]

1. *Malicious prosecution.* In an action for malicious prosecution, "the essence of the tort is . . . interference with the right to be free from unjustifiable litigation." *Foley* v. *Polaroid Corp.*, 381 Mass. 545, 552 (1980), citing Prosser, Torts § 119, at 834 (4th ed. 1971). The essential element to be proved is that the defendant lacked probable cause to believe that the plaintiff had committed the crime charged, and the plaintiff has the burden of proving that element. *Morreale* v. *DeZotell*, 10 Mass. App. Ct. 281, 281-282 (1980), and cases cited.

The defendants argue that the plaintiff's proof was insuf-ficient to support a finding that Gillespie lacked probable cause. In addition, they contend that even if probable cause was lacking, Officer Gerard's official decision to bring the complaints relieved the defendants of responsibility for the prosecutions. We review these arguments in the context of motions for directed verdicts under the rule that "if there is any evidence to support . . . [findings] essential to the maintenance of the cause of action, it must be submitted to the jury." *Willis* v. *Gurry*, 331 Mass. at 21-22. See *Boyle* v. *Wenk*, 378 Mass. 592, 593 (1979).[10]

---

[9] The Marshfield police department's entire file on the case was intro-duced in evidence without objection. The file contained various reports, notes and other documents which tended to corroborate material aspects of Officer Gerard's testimony, and to contradict Gillespie's testimony. From this, the jury could have concluded that portions of Gillespie's trial testimony, particularly concerning his meeting with the officer, were false.

[10] We are aware that there is special "distribution of function between judge and jury which distinguishes malicious prosecution actions from other torts." *Seelig* v. *Harvard Coop. Soc.*, 1 Mass. App. Ct. at 345. See *Stone* v. *Crocker*, 24 Pick. 81, 84-85 (1832); Annot., 87 A.L.R.2d 183, 186-188 (1963). "It has been said repeatedly that when the facts are fully established or undisputed, probable cause becomes a question of law." *Keefe* v. *Johnson*, 304 Mass. 572, 577 (1939). *Lincoln* v. *Shea*, 361 Mass. 1, 5 (1972). In those situations, this rule apparently has the practical ef-fect of requiring the judge to decide the issue of probable cause, even though the evidence, viewed under the usual directed verdict standard, is

Probable cause in the context of a civil action for malicious prosecution[11] has long been defined as "such a state of facts in the mind of the . . . [defendant] as would lead *a man of ordinary caution and prudence* to believe, or entertain an honest and strong suspicion," that the plaintiff had committed a crime (emphasis supplied). *Lincoln* v. *Shea,* 361 Mass. 1, 4-5 (1972), quoting from *Muniz* v. *Mehlman,* 327 Mass. 353, 359 (1951), quoting from *Bacon* v. *Towne,* 4 Cush. 217, 238-239 (1849). As this definition suggests, probable cause is judged by an objective, rather than a subjective, standard. *Seelig* v. *Harvard Coop. Soc.,* 1 Mass. App. Ct. at 344. See *Coblyn* v. *Kennedy's, Inc.,* 359 Mass. 319, 326 (1971). Thus, the defendant's belief in the plaintiff's guilt must have been such as would exist "in the mind of a reasonable man." *Bacon* v. *Towne, supra* at 239. *Stone* v. *Crocker,* 24 Pick. 81, 86 (1832) ("an ingenuous and unprejudiced man, of common capacity, in the defendant's situation").

In determining whether the defendant's belief was reasonable in an objective sense (or more accurately, whether the evidence supported a finding that it was unreasonable), we examine the information known to him "at the time he instituted the complaint rather than . . . what may turn out later to have been the actual state of things." *Lincoln* v. *Shea, supra* at 5, quoting from *Muniz* v. *Mehlman, supra.* Implicit in this inquiry, however, is the question whether it

---

sufficient to permit the jury to decide the issue. It is equally well established, however, that the rule applies only in the situations specified, *Casavan* v. *Sage,* 201 Mass. 547, 553 (1909); *Griffin* v. *Dearborn,* 210 Mass. 308, 312-313 (1911), and that "[w]hen the facts are disputed . . . probable cause is a question for the jury." *Seelig* v. *Harvard Coop. Soc., supra* at 344. See *Stone* v. *Crocker, supra* at 85. In the present case, it suffices to say that the evidence set out above raises disputes of material fact, and that they bear not on whether the plaintiff actually committed the crimes charged, but on whether the defendants had probable cause to believe that she did. See *Lincoln* v. *Shea, supra* at 5 n.1. We therefore proceed to the usual inquiry whether the evidence most favorable to the plaintiff supports a finding that probable cause was lacking.

[11] We have no occasion to compare "probable cause" for this purpose with "probable cause" justifying various actions in criminal prosecutions.

was reasonable for the defendant to have relied upon that information, given its quality, quantity, and the availability of additional information. The answer to this question depends on the facts of the individual case. In several instances, the information known to the defendant was held to have been so trustworthy as to require the conclusion, as matter of law, that reliance upon it was reasonable. See *Seelig v. Harvard Coop. Soc.*, *supra* at 346-347 (defendant knew that plaintiff had made written confession, though he was unaware that police officer may have dictated portions). See also *Lincoln v. Shea*, *supra* at 5-6 (defendant knew that plaintiff's driver's license was under suspension, though he was unaware that the snowplow plaintiff was driving did not fit the statutory definition of a motor vehicle). In some situations, then, knowledge of reliable information relieves the defendant of "the obligation of sifting and evaluating other possibly exculpatory evidence" regarding the crime of which the plaintiff is suspected. *Seelig v. Harvard Coop. Soc.*, *supra* at 347.[12]

In several other cases, however, the information known to the defendant was held to have been sufficiently unreliable or incomplete to support a finding that it was unreasonable to rely upon it without additional information. See *Griffin v. Dearborn*, 210 Mass. 308, 313 (1911) (where defendant knew that his horse was taken by G's minor son, and did not know whether the son did so, as the son claimed, on order from G, "[t]he defendant's immediate prosecution of the son without any precedent investigation" could be found to lack reasonable grounds); *Smith v. Eliot Sav. Bank*, 355 Mass. at 548 (where defendant bank failed to pursue information as to whereabouts of S, in whose name unauthorized withdrawals were made, and teller identified the plaintiff as forger seven months after brief withdrawal transaction, jury could have found that identification was

---

[12] Cf. *Burnham v. Collateral Loan Co.*, 179 Mass. 268, 275 (1901) (investigation unnecessary where it would be immaterial to crime suspected); *Keefe v. Johnson*, 304 Mass. 572, 578 (1939) (investigation unnecessary where there is no one of whom to inquire).

"so suspect that a 'man of ordinary caution and prudence' would not have relied upon it," quoting from *Bacon* v. *Towne,* 4 Cush. at 239).

From these cases, it appears that private persons are not at liberty to initiate criminal prosecutions precipitously, on the basis of information which is neither reasonably complete nor reliable. Rather, where a person has some information which suggests that another has committed a crime, it is first "[h]is duty . . . to ascertain . . . whether there is reasonable and probable cause for a prosecution." *Herniman* v. *Smith,* [1938] A.C. 305, 319, quoted in *Higgins* v. *Pratt,* 316 Mass. 700, 709 (1944), and *Muniz* v. *Mehlman,* 327 Mass. at 360. Where that duty is not satisfied, a complainant will be subject to liability under the general principle outlined long ago by Chief Justice Shaw: "A man ought not to take out legal process, to . . . arrest the person of another, without some knowledge on the subject; and he ought to be responsible for the consequences, if he does this in utter recklessness and ignorance." *Willis* v. *Noyes,* 12 Pick. 324, 327 (1832), quoted in *Higgins* v. *Pratt, supra* at 710. More recently, the principle for determining liability has been defined in specific terms by the Restatement (Second) of Torts (1977), which summarizes the current test of probable cause as follows: "the defendant has probable cause only when a reasonable man in his position would believe, and the defendant does in fact believe, that he has sufficient information as to both the facts and the applicable law to justify him in initiating the criminal proceeding without further investigation or verification." *Id.,* § 662, Comment j, at 429.[13]

---

[13] The test articulated by the Restatement is in accord with the law of a number of other jurisdictions. See *Watzek* v. *Walker,* 14 Ariz. App. 545, 548-549 (1971) (holding that investigation was insufficient prior to prosecution for forgery of check); *Food Fair Stores, Inc.* v. *Kincaid,* 335 So. 2d 560, 563 (Fla. Dist. Ct. App. 1976); *Hoene* v. *Associated Dry Goods Corp.,* 487 S.W.2d 479, 483 (Mo. 1972); *Boose* v. *Rochester,* 71 App. Div. 2d 59, 67-68 (N.Y. 1979); *Lambert* v. *Sears, Roebuck & Co.,* 280 Or. 123, 131-132 (1977). See also Prosser, Torts, *supra* at 842.

The Restatement suggests that the following factors are important in determining whether further investigation should have been made: "the

Applying these principles here, in the context of motions for directed verdicts, we think that the information known to Gillespie was insufficient to require the conclusion, as matter of law, that it was reasonable to initiate complaints against the plaintiff without obtaining additional information. Gillespie specifically represented to Officer Gerard that the plaintiff had committed a "forgery." In view of that representation, the issue of probable cause turned on whether it was reasonable for Gillespie to believe that it was the plaintiff who endorsed the check. We examine the essential evidence on that issue.

Gillespie testified at trial that he was not personally involved in the dealership's handling of the check until June 24, 1976, when he received the check back from the bank along with a copy of the plaintiff's affidavit. Even if we accept that testimony, however, it is clear that Gillespie learned at least the following facts at that time: that the check was not endorsed when the dealership originally received it; that it had previously been returned by the bank for that reason; that it was then redeposited by the dealership with a signature on the back; and that the plaintiff had sworn in an affidavit that she did not sign the check, and that her signature had, in fact, been forged. In addition, Gillespie admitted at trial that he had no personal knowledge then, or at any other time, whether the plaintiff had signed the check. Based on these facts, the jury could certainly have found that at the time Gillespie first became involved in the matter, which was the day before he met with Officer Gerard, he lacked

---

necessity of prompt action to prevent escape; the availability of information other than that in the possession of the accuser; the existence of a ready opportunity to obtain an explanation from the person accused or to ascertain his reputation; the character of the source from which the accuser's information comes. The accuser may properly be required to make inquiry as to the veracity of his informants when his belief is founded upon their information. He may even be required to distrust the accuracy of his own observations when they are made under such circumstances that they may be suspected of inaccuracy. In all these cases the fact that an investigation might prove dangerous, or the probability that it would be futile, are matters to be taken into account." *Id*. at 428-429.

probable cause to charge that the plaintiff had committed a forgery. Moreover, the jury could have concluded that given the plaintiff's assertion that she did not endorse the check, and particularly given Gillespie's previous lack of involvement, a reasonable person in his position would have considered the possibility that one of his own employees had signed the check, and would have investigated that possibility.[14]

Gillespie testified that he attempted in several ways to obtain additional information on the matter. However, we do not think those efforts, viewed in the light most favorable to the plaintiff, were sufficient to require a finding that his duty of reasonable investigation had been satisfied.[15] Nor did those efforts yield sufficient information to require a

---

[14] The plaintiff testified that she was in Ohio between April 12 and April 14, 1976, which raises the inference that she could not have been the person who endorsed the check for redeposit. Gillespie testified that he learned from his records that the check must have been endorsed during that period, although there is nothing to show that he did so prior to meeting with Officer Gerard. It is apparent, however, that he did not learn that the plaintiff had been in Ohio during that period. We note that this misapprehension might well have been avoided if Gillespie had simply written to the plaintiff at the Ohio address stated in her affidavit, which he might reasonably have been expected to do in the course of his investigation. See Smith v. Eliot Sav. Bank, supra (involving defendant's failure to pursue information regarding suspect's whereabouts). In addition, we note that Gillespie's belief at the time of his complaint that the plaintiff was moving to Ohio was not alone sufficient to establish probable cause. See Londy v. Driscoll, 175 Mass. 426, 427 (1900) (involving prosecution against a Boston resident who travelled frequently brought by a person who believed that the resident lived out of State).

[15] Gillespie testified that he asked several of the dealership's employees "who had signed" the check. The record does not show, however, that he did so prior to meeting with Officer Gerard. In any event, he later stated, either in contradiction of the testimony above or by way of clarification, that he did not ask any employee whether that employee had signed the check. In addition, Gillespie testified that on the morning of his meeting with Officer Gerard, he first went to the plaintiff's house in an effort to talk to her. That testimony, however, is contradicted by Officer Gerard's report, which states that Gillespie told him that he sent his son to the house. Finally, Gillespie implied that he had made other attempts to consult the plaintiff, but his testimony contains no specification of when or how he did so.

finding that probable cause existed. The only additional information which Gillespie obtained was that an employee had allegedly taken the check to the plaintiff's house and returned to the dealership with the endorsement. We do not deal with the credibility of Gillespie's testimony on this point. It is clear from his own testimony, however, that he may have heard this information from an employee other than the one involved; that the employee did not see the plaintiff endorse the check; and that he did not even see her present at the house. Given such defects, this information lacked reliability, and did nothing to show that it was reasonable for Gillespie to believe that the plaintiff was the person who signed the check.[16] Moreover, it appears that Gillespie did not relate this account of the endorsement to Officer Gerard, but told him that the check was endorsed in the office of the dealership, a discrepancy which is not explained by the record.

In sum, we think the evidence permitted a finding that Gillespie recklessly made categorical statements to Officer Gerard accusing the plaintiff of forgery based on ambiguous and superficial information, and that those statements resulted in the plaintiff's arrest.[17] It is established in a related

---

[16] Even if it had been reasonable for Gillespie to believe that the plaintiff signed the check, it is difficult to understand how he could reasonably have believed that she had committed a forgery. The check was payable to Mary Carroll, it was endorsed in that name, and Gillespie believed that it was the plaintiff who had endorsed it. Thus, Gillespie could only have believed that the plaintiff was not Mary Carroll, but Mary Romanski or Fran Carroll. Gillespie testified, however, that he did not begin to deal with this matter until the check was returned with the plaintiff's affidavit; and that affidavit, also in the name of Mary Carroll, stated not only that she had not endorsed the check, but further, that someone had forged her signature. When questioned at trial why, in light of this information, he proceeded to charge the plaintiff with forgery, Gillespie conceded that it seemed "pretty stupid" in hindsight.

[17] In fairness, it should be noted that the plaintiff was not entirely blameless in this matter. She was, of course, justified in disclaiming the endorsement if the signature was not hers. But just as Gillespie failed to talk to her in order to resolve this problem, she also failed to consult him.

In addition, the defendant suggests that the plaintiff's affidavit was at least partially false insofar as it asserted that she had not received "any

context that an individual's freedom of movement cannot be subject to the "'honest . . . suspicion' of a shopkeeper . . . [acting] on his own 'inarticulate hunches.'" *Coblyn* v. *Kennedy's, Inc.*, 359 Mass. at 325 (false arrest). Likewise, in the present context, probable cause requires not only a subjective belief that another has committed a crime, but also objective facts which provide reasonable support for that belief. See Restatement (Second) of Torts, *supra.* In the present case, we conclude that the objective facts supporting the defendants' belief were insufficient to require that verdicts be directed in their favor, and that the issue of probable cause was properly left to the jury.

Our conclusion is not altered by the defendants' alternative argument that Officer Gerard's official decision to bring the complaints relieved them of responsibility for the prosecutions. It is apparent from the discussion above that this is not a case in which the defendant "made a fair and full presentation of facts to the officer and left the course to be pursued to his judgment without pressure or coercion." *Mason* v. *Jacot*, 235 Mass. 521, 525-526 (1920), summarizing the situation in *Burnham* v. *Collateral Loan Co.*, 179 Mass. 268, 273-274 (1901). See *Seelig* v. *Harvard Coop. Soc.*, 355 Mass. 532, 536 (1969). Here, Gillespie specifically told Officer Gerard that "he wanted the police to arrest" the plaintiff, or at least that he "wanted her brought into court." In this situation, the officer's application for the complaints "might fairly be regarded as within the terms of the directions given to [him]" by the defendant. *Mason* v. *Jacot*,

---

benefit" from the check. Although it is true that the car was returned to the plaintiff in exchange for the check, we note that it was returned to the dealership the following day on the ground that the repairs were insufficient, see note 5, *supra*, and there is nothing to show whether the car was thereafter returned to the plaintiff, or whether the defendants were thereafter paid in full for the repairs. At trial, the plaintiff testified as to her state of mind regarding the "benefit" allegation in the affidavit, and she was cross-examined on that subject. For present purposes, it suffices to say that Gillespie's knowledge of that allegation was not sufficient to establish, as matter of law, that it was reasonable for him to initiate the complaints without additional information.

*supra* at 525.  See *Griffin* v. *Dearborn, supra.*  Accordingly, the defendants' motions for directed verdicts were properly denied on this ground.

2. *Abuse of process.*  As to the abuse of process claim, the defendants likewise argue that the denial of their motions for directed verdicts was error.  On the evidence discussed above, we disagree.  The essence of this tort is the malicious use of legal process "to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." *Jones* v. *Brockton Pub. Mkts., Inc.*, 369 Mass. 387, 389 (1975), quoting from *Quaranto* v. *Silverman*, 345 Mass. at 426.  *Chemawa County Golf, Inc.* v. *Wnuk*, 9 Mass. App. Ct. 506, 508-509 (1980).  See Restatement (Second) of Torts, *supra,* § 682, Comment a, at 474; Prosser, Torts, *supra,* § 121, at 856-857.  Here, the evidence was sufficient to support findings that Gillespie initiated the complaints with knowledge that they were groundless, see *Lorusso* v. *Bloom*, 321 Mass. 9, 10 (1947), and cases cited; Prosser, Torts, *supra*; that he sought to use the criminal process to collect a civil debt, see note 8, *supra*; cf. *Griffin* v. *Dearborn, supra; Pihl* v. *Morris*, 319 Mass. 577, 580 (1946); and that he did so in spite of Officer Gerard's explicit warning that this was not its proper purpose. The defendant's motions were therefore properly denied.

*Judgment affirmed.*