DAVID ZIEMBA & another[1] vs. FO'CS'LE, INC. & another.[2]

Barnstable.  November 9, 1984. — March 19, 1985.

Present: PERRETTA, KAPLAN, & WARNER, JJ.

*Malicious Prosecution.  Emotional Distress.*

At the trial of a claim for malicious prosecution brought by plaintiffs who were arrested after refusing to leave the defendant's drinking establishment, a verdict was properly directed for the defendant, where the evidence, and the inferences permissible therefrom, could not support a finding that the defendant's bartender demanded the plaintiffs' arrest by police, or that she furnished the police with false information to influence their actions, or that the police did not exercise independent judgment in arresting the plaintiffs. [485-488]

At the trial of a claim for intentional infliction of emotional distress brought by plaintiffs who were arrested after refusing to leave the defendant's drinking establishment, the judge correctly ruled as matter of law that the conduct of the defendant's bartender had not been extreme or outrageous and that any emotional distress suffered by the plaintiffs had not been severe. [489-490]

CIVIL ACTION commenced in the Superior Court on May 16, 1977.

The case was tried before *Eileen P. Griffin,* J.

*Evan T. Lawson (Lena M. Wong* with him) for the plaintiffs.
*Charles M. Sabatt* for the defendant.

PERRETTA, J. The defendant Fo'cs'le, Inc. (Fo'cs'le), is a bar in Provincetown which, during the summer season, serves juices, soda, liquor, and snacks to the public. In the winter, sandwiches are added to the menu. The atmosphere at the Fo'cs'le, which has a jukebox and pinball machine, can be described as informal. Fo'cs'le also had a "house" rule or policy

---

[1] Sarah Ziemba.

[2] Dorothy Griffin, against whom a default issued under Mass.R.Civ.P. 55(a), 365 Mass. 822 (1974), presumably for her failure to answer to the plaintiffs' complaint. She is not a party to this appeal.

that children were not allowed on the premises after 6:00 P.M. When Dorothy Griffin (Dorothy), the barmaid at the Fo'cs'le on the evening in question, enforced this rule against the plaintiffs David and Sarah Ziemba (David and Sarah) and their three year old son an argument ensued between Dorothy and David. David was of the view that Dorothy, with whom he had kept company while separated from Sarah, was selectively enforcing the rule against him out of hostility over his reunion with Sarah.

Dorothy gave David an ultimatum to the effect that, if he did not leave, she would call the police and have him arrested. David and Sarah refused to remove themselves, and the police were called. Upon their arrival, they spoke with Dorothy and then advised David and Sarah that, if they did not leave, they would be arrested. When David and Sarah stood fast, they were arrested and escorted to the police station. After being found not guilty on complaints charging them with criminal trespass, G. L. c. 266, § 120, David and Sarah brought this action against Dorothy and Fo'cs'le, alleging false imprisonment, malicious prosecution, and the intentional infliction of emotional distress. At the close of their evidence, the trial judge entered judgment against them on a directed verdict under Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974).[3] We affirm.

1. *Malicious Prosecution.*

On their claim against Fo'cs'le for malicious prosecution, the plaintiffs were required to show that they suffered damages because Dorothy, as agent of Fo'cs'le, instituted criminal proceedings against them with malice and without probable cause and that the proceedings terminated in their favor. See *Beecy* v. *Pucciarelli,* 387 Mass. 589, 593 (1982). See also Nolan, Tort Law § 52 (1979). The trial judge concluded that the plaintiffs had failed to meet their burden because the undisputed evidence established that the police arrested them in the exercise of their independent discretion and, therefore, that Dorothy had

---

[3] As the plaintiffs make no argument concerning their claim for false imprisonment, we affirm the judgment as to that claim without discussion. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

not initiated the criminal proceedings. See, e.g., *Shea* v. *Sullivan,* 261 Mass. 255, 258-259 (1927). Compare *Mason* v. *Jacot,* 235 Mass. 521 (1920). See also Restatement (Second) of Torts § 653 comment d, at 408 (1977) ("The giving of the information or the making of the accusation, however, does not constitute a procurement of the proceedings that the third person initiates if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit").

The plaintiffs argue that whether they were arrested at Dorothy's direction or at the discretion of the police was a question of fact for the jury. We review the evidence in a light most favorable to the plaintiffs (see *Carroll* v. *Gillespie,* 14 Mass. App. Ct. 12, 18 [1982], and cases therein cited) to determine if there is any support for their claim that Dorothy initiated the criminal proceedings against them.

From September of 1975 until March of 1976 and while separated from Sarah, David was romantically involved with Dorothy. Sarah knew about their relationship and although, according to her testimony, she "understood," she was not happy about it. During that period, David would frequently go to the Fo'cs'le, bringing along his then two year old son, to meet Dorothy, who would be ready to leave work, usually between 6:00 P.M. and 6:30 P.M. Shortly after David and Dorothy returned from a trip to Puerto Rico, paid for by Dorothy, the relationship tapered off and came to a gradual end.

On April 3, 1976, David and Sarah appeared in court for their divorce, had dinner together, and reconciled. At about 4:00 P.M. on August 25 of that year, they decided to drop in at the Fo'cs'le. Their son, now about three and one-half years old, was with them. Dorothy was tending the bar, and they sat at one of the seven or eight tables. David went to the bar and bought a beer, which he shared with Sarah. Under another "policy" of the Fo'cs'le, their child was given fruit juice free of charge. Time passed, David played pinball, and Sarah went up to the bar and bought another beer.

Trouble began at about 5:55 P.M., when David went to the bar and asked Dorothy for another beer. Dorothy refused to

serve David, telling him, "It's five minutes to six. I'm not serving you. Children aren't allowed in here after six." David would not leave with his son because, as he informed Dorothy, although he knew of the "house rule," he also knew that it was selectively enforced, mostly against tourists, that she was discriminating against him contrary to the rules of the Alcoholic Beverages Control Commission, that she had no right to ask him to leave, and that he intended to stay. He returned to the pinball machine. Dorothy became angry and loud in her insistence that, if he did not leave, she would call the police and have him arrested.

David stood fast, the police arrived, and David greeted them at the door.[4] They asked him to be seated and went over to Dorothy, who was behind the bar. Neither David nor Sarah heard the conversation between the police and Dorothy.[5] After speaking with Dorothy, the police came over to David and Sarah and said to David, according to his testimony, that "Dorothy wanted us out of there and if we didn't leave that we would be arrested for trespassing." David replied that he "felt that they had no right arresting us for trespassing," that "[w]e didn't do anything wrong," and that they were not going to leave. The police put the same statement to Sarah, who responded in a similar manner to David, adding that she would not leave without him.

---

[4] Dorothy testified that she did not call the police. David said that she did, but he agreed (on cross-examination) that he might have done so. He remembered that during his "heated" argument with Dorothy, he had offered to place the call. We proceed on the basis that Dorothy called the police.

[5] Dorothy's version of the conversation is revealed through her testimony. (The police were not called to testify.) She stated that she informed the police that because of the "house" rule, she wanted David and Sarah to leave and that they could return but without their child. The police advised her that she would have to ask David and Sarah to leave in their (the police) presence. She went over to David and Sarah's table, again asked them to leave, they refused, and she returned to her place behind the bar. David and Sarah had no memory of Dorothy's repeating her demand to them in the presence of the police. As David and Sarah do not have either knowledge or memory of these alleged facts which are not favorable to them, we disregard Dorothy's testimony on these points.

Criminal proceedings are deemed instituted, in an action for malicious prosecution, upon the happening of any one of a number of events that can take place in the criminal process. See Restatement (Second) of Torts § 654 (1977). For sound reasons of public policy, however, the mere act of calling the police for aid does not rise to the level of instituting criminal proceedings. See *Wingersky* v. *E. E. Gray Co.,* 254 Mass. 198, 201 (1926) ("It is the duty of every member of society to see to it that crime is punished so far as lies in his power"). See also *Seelig* v. *Harvard Coop. Soc.,* 1 Mass. App. Ct. 341, 344 (1973), and authorities therein cited. On the evidence presented, criminal proceedings were instituted against David and Sarah no earlier than when they were arrested. See Restatement (Second) of Torts § 654(2)(c) and comment e, at 413 (1977). See also Nolan, Tort Law § 52, at 64 (1979).

The evidence most favorable to Sarah and David shows, at best, that Dorothy told David that if he did not leave, she would call the police and have him arrested, that she did call the police, and that she engaged in conversation with them upon their arrival. The police then advised David and Sarah that Dorothy wanted them to leave the Fo'cs'le and that, if they did not do so, they would be arrested for trespassing. Neither those facts nor the inferences which could reasonably be drawn therefrom can support a finding that Dorothy demanded or directed the police to arrest David and Sarah, that she furnished the police with false information to influence their actions, or that the police did not exercise their independent discretion in arresting David and Sarah.[6] See *Burnham* v. *Collateral Loan Co.,* 179 Mass. 268 (1901); *Shea* v. *Sullivan,* 261 Mass. at 258 Compare *Mason* v. *Jacot,* 235 Mass. at 524-526; *Carroll* v. *Gillespie,* 14 Mass. App. Ct. at 25. See generally Prosser, Torts § 119, at 837 (4th ed. 1971).

---

[6] Evidence that the "house" rule was not enforced uniformly and that Dorothy invoked the rule out of hostility does not render those facts related by her to the police (and set out in note 5, *supra*) false, and hence does not make the conversation evidence favorable to David and Sarah.

2. *Intentional Infliction of Emotional Distress.*

On David and Sarah's claim for the intentional infliction of emotional distress, the trial judge ruled as matter of law that Dorothy's conduct was neither extreme and outrageous, beyond all possible bounds of decency, nor utterly intolerable in a civilized society. Moreover, she concluded that the emotional distress sustained by David and Sarah was not severe or of a nature that no reasonable person could be expected to endure it. See *Agis* v. *Howard Johnson Co.,* 371 Mass. 140, 144-145 (1976).

We pick up with our recitation of the evidence in a light most favorable to David and Sarah at the point where they advised the police that they would not leave the Fo'cs'le voluntarily. David testified that he knew the police would not arrest him if he left the Fo'cs'le with his son, but he told the police, "If you have to arrest me, then arrest me." The police then left the Fo'cs'le with David and Sarah, who took turns carrying their son, and walked two blocks to the police station. The police did not handcuff or otherwise touch David or Sarah; rather, they all simply walked "abreast" of each other. Sarah testified that as they passed some people she knew, they asked what was "going on."

David and Sarah were at the police station no longer than an hour. They were not placed in a cell, and they were not required to post bail money. After leaving the police station, they went home, had supper, and went to bed. They appeared in court twice on the criminal complaints, and the proceedings were concluded on September 2, 1976.

David and Sarah described their child as being in a state of "awe" throughout the events of the evening of August 25th. At the police station he asked Sarah, a number of times, questions to the effect of "What are they doing to Daddy?" David and Sarah testified that they suffered humiliation and anxiety at the time of their arrest and during the pendency of the criminal charges against them.[7]

---

[7] A motion to strike Sarah's testimony that she also suffered severe headaches that required medical attention was allowed for her failure to show that the headaches were not related to her preexisting sinus condition

We see nothing in the evidence that satisfies those elements set out and discussed in *Agis* v. *Howard Johnson Co.,* 371 Mass. at 142-145. See also, *Boyle* v. *Wenk,* 378 Mass. 592 (1979).

3. *Conclusion.*

It follows from our conclusions concerning Dorothy's lack of liability that we need not consider whether her acts were committed in the scope of her employment at the Fo'cs'le. See *Fanciullo* v. *B. G. & S. Theatre Corp.,* 297 Mass. 44, 47 (1937).

*Judgment affirmed.*

---

which also required medical attention. No argument is made to us concerning that ruling. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).