Hinkle, J.
This action arises from an underlying sexual harassment claim plaintiff Pamela Zortman had asserted against her former employer, defendant Astra, USA, Inc. (“Astra”), and Astra’s former CEO and President, defendant Lars Bildman (“Bildman”). That claim was settled. As a result of subsequent publication of her sexual harassment allegations, plaintiff commenced this action for breach of contract, invasion of privacy, tortious interference with advantageous business and contractual relations, defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress. In separate motions, defendants move for summary judgment on all claims, and plaintiff moves for summary judgment as to liability only on all her claims.
After hearing, on the basis of the record before me, the plaintiffs motion is denied in its entirety, and defendants’ motions are allowed in part.
BACKGROUND
The undisputed facts are as follows. Astra is a pharmaceutical company headquartered in Westborough, Massachusetts. It is the wholly-owned subsidiary of Astra AB, a Swedish company. Until August 22, 1995, Astra employed plaintiff as a sales representative. Until April 28, 1996, Bildman was Astra’s CEO and President.
In late November 1995, Astra learned that Mark Maremont, a reporter for Business Week, was investigating allegations of widespread sexual harassment at Astra and had contacted former sales representatives *77 regarding these allegations. When Maremont phoned plaintiff in November 1995 plaintiff refused to speak to him about Astra.
On December 5, 1995, plaintiff sent a letter to Bildman alleging that he had sexually harassed her on June 14, 1995 at a company dinner dance at the Westborough Marriott Hotel.[2] In the letter she demanded $3,000,000 from Astra to compensate her for Bildman’s wrongdoing. In response to plaintiffs claim, Astra commenced an investigation. William P. Joy, outside counsel for Astra, interviewed more than 100 individuals who were present at the hotel on the night in question.
In December 1995, Astra’s general counsel, Charles Yon, hired a media advisor, Arnold Zenker, to assist Astra with adverse publicity. On December 22, 1995, Yon informed Zenker that plaintiff had recently asserted a sexual harassment claim against Astra and Bildman based upon the dinner dance incident.
On January 5, 1996, the parties to this action settled plaintiffs sexual harassment claim and executed a Confidential Settlement Agreement and Release (hereinafter “Agreement”). Under the Agreement, plaintiff released all claims she had against Astra and Bildman which arose out of her employment at Astra. In exchange, Astra paid plaintiff $100,000. The Agreement included the following provisions:
4. Non-Admissions. Astra and all those named in Paragraph 3 above[3] expressly deny any and all liability to Zortman and the parties agree that nothing in this Agreement shall be deemed to represent a concession or admission or [sic] such liability or any waiver of any defense to any such liability.
6. Confidentiality. Zortman and her attorneys and agents agree to keep confidential the fact of and the terms and conditions of this Agreement and Release and not disclose them to any person, except that Zortman may advise her family members, attorneys, and tax and financial advisors regarding the terms of this Agreement. Astra and all those named in paragraph 3 above and their attorneys and agents agree to keep confidential the fact of and the terms and conditions of this Agreement and Release and not disclose them to any person except that Astra may disclose the fact of and the terms of this Agreement to its legal, tax and auditor advisors as long as they are advised and agree to maintain the confidentiality of the fact and terms of this Agreement. Zortman and Astra agree not to introduce this Agreement in any litigation or proceeding except any action to enforce the terms of this Agreement. It will not be a violation of this Agreement for Zortman or Astra to provide testimony or documents in response to a legally enforceable subpoena or other legal process, provided Astra or Zortman is given reasonable advance notice of any proceeding in which such testimony or documents are sought and Astra or Zortman has an opportunity to seek a protective order, or be able to take whatever other steps Astra or Zortman deem appropriate to protect their respective interests, including their respective interest in preserving the confidentiality of this Agreement. Zortman will not object to Astra’s seeking nor will Astra object to Zortman’s seeking to be present at or seeking to interpose objection in any proceeding described above.
8. Response to Inquiries. Zortman and Astra and all those named in paragraph 3 above agree that, in response to any inquiry regarding the status of her dispute with Astra and any of those named in Paragraph 3 above, Zortman and Astra will state only that no claim or action has been filed by Zortman. In response to any inquiry from a prospective employer of Zortman’s, or any other individual or entity seeking information from Astra regarding Zortman, Astra agrees that it will indicate that it is Astra policy only to provide the following information, and will provide only the following, in response to any such inquiry: the dates of Zortman’s employment with Astra, Zortman’s position with Astra, and Zortman’s last salary level at Astra.
11. Mutual Nondisparagement. Both Zortman and Astra and all those named in Paragraph 3 above agree that they will not say anything which is false, disparaging or negative regarding the other at any time.
After execution of the Agreement, in response to inquiries from Astra employees about plaintiffs claim, Bildman said “There is no case. ” Although Bildman did not inform any one about the fact of the Agreement or its terms, Bildman believed that he could deny plaintiffs allegations that he had harassed her, and he did so.
Astra’s counsel, Yon, disclosed to Zenker, the media advisor, that the claim with plaintiff had settled, and that the Agreement contained a confidentiality provision.[4]
On April 16, 18, and 24, 1996, Maremont sent letters to Astra outlining numerous allegations of sexual harassment which he had uncovered in his investigation, and he sought Astra’s response. The incident between plaintiff and Bildman is outlined in Maremont’s April 24, 1996 letter.
On April 22, 1996, Maremont and Jane Sasseen of Business Week met with Yon, Zenker, Ken Rabin and Lynn Tetrault of Astra. Plaintiffs name was not mentioned at the meeting.
On April 28, 1996, Astra suspended Bildman and barred him from Astra’s premises pending completion of an internal investigation into allegations of financial and other impropriety.[5] In a letter to Bildman, Carl Gustaf Johansson, a Director of Astra, stated among other things:
*78 I have been authorized to advise you that the Board of Directors of [Astra] has suspended you with pay immediately from your positions as President, Chief Executive Officer and Director of the Company pending an investigation into allegations regarding various events of which you are aware as well as other matters, which if substantiated, would result in your termination for cause . . .
As a suspended employee you will not be allowed access to any of the premises of the Company unless specifically authorized by the interim Chief Executive Officer and accompanied by an employee or counsel designated by the Company.
All other employees have or will be instructed not to communicate with you until the investigation is complete. Please return all property of Astra you may have including keys, identification papers, credit cards, office equipment, documents of any kind and any other property you have in your possession to Jan Larsson as soon as possible.
At this point we expect that the team you have assembled to protect the interests of Astra will continue to defend it. We trust that you realize that the professionals currently retained represent the Company and not you personally and therefore, if you desire separate counsel, you should consider other firms.
The following day, April 29, 1996, Astra issued a press release addressing Bildman’s suspension in light of the sexual harassment allegations. The Wall Street Journal and the Boston Globe reported Bildman’s suspension on April 30, 1996. Plaintiff read about Bildman’s suspension in the Globe that same day.
On May 1, 1996, Bildman retained the Boston law firm of Eckert Seamans Cherin & Mellott, L.L.C. to represent him personally regarding the various allegations of misconduct levied against him arising out of his Astra employment. That same day, Roderick MacLeish, a partner at Eckert Seamans, contacted Mare-mont at Business Week seeking an opportunity to respond to the allegations against Bildman. After speaking with Maremont, MacLeish sent two letters to him in which he stated that Bildman denied all allegations in Maremont’s April 18th and April 24th letters to Astra. In one letter, MacLeish included what he termed “Statement of Lars Bildman” which MacLeish stated that Bildman authorized him to release to Maremont. This “Statement,” which was unsigned by Bildman, provides in part: “I categorically deny the allegations set forth in the April 18, 1996 letter of Business Week as well as those allegations set forth in Business Week’s letter of April 24, 1996.” Plaintiffs allegations were specifically outlined in Maremont’s letter of April 24, 1996.
On May 2, 1996, Business Week published as its cover story an article by Maremont entitled “Abuse of Power, The Astonishing Tale of Sexual Harassment at Astra’s U.S. Pharmaceutical Subsidiary.” The first two paragraphs of the article outline plaintiffs allegations concerning the dinner dance incident. Those paragraphs state as follows:
The lights were dim, the music was softly romantic. It was the final night of the Astra USA, Inc. national sales meeting last June, and pairs of employees were dancing in the ballroom of a suburban Boston hotel. Astra President and Chief Executive Officer Lars Bildman, then 49, was entwined with a 25-year-old sales representative, Pamela L. Zortman. Two onlookers noticed that Bildman, extremely drunk, was running his hands along her back and nibbling at her neck.
Suddenly, Zortman rushed into a nearby rest room. Sobbing, she told other women there that Bildman had tried to kiss her. Zortman, who had worked at the company less than a year, apparently didn’t get much sympathy from two longtime female managers present. According to accounts Zortman later gave to two sources, the women told her in effect: “That’s the way it is at Astra, and you’d better get used to it.”
The only other specific reference to plaintiff in Maremont’s article appeared later in the stoiy: “the old Astra shows through when the liquor flows, as last June’s incident with Zortman demonstrated.”
Plaintiff concedes that she does not know who spoke to Maremont about her. It is undisputed that any information about these paragraphs which Mare-mont obtained after January 5,1996 came from someone other than the parties.
Although the Business Week article is lengthy, only one statement is directly attributed to Bildman. There Maremont states “On May 1, as the article was going to press, Bildman categorically denied the allegations in a written statement."
Two statements in the article are attributed to Astra. The first provides: “In a preliminary interview one week before Bildman’s suspension, Astra USA General Counsel Charles E. Yon and national sales manager Robert Vogel vehemently denied the allegations of excessive drinking and widespread sexual harassment. Yon refused, however, to talk about complaints that had been settled, and he declined to respond to numerous specific allegations.” Later in the article, Maremont states: “Yon denies that Astra paid off women in exchange for their silence. Astra says there have been only a few settlements, and that the majority of the claims came from people fired for poor performance. Though it says most of the claims were baseless, it insists the settlements were made primarily to avoid costly litigation.”
*79 Immediately following publication of the Business Week article, the Boston Globe, the Boston Herald and the Wall Street Journal published several stories concerning Astra. Plaintiff is not named in any of those newspaper articles published between May 1, 1996 and May 7, 1996. Benjamin Kincannon, an Astra spokesperson, is allegedly quoted in several of the newspaper articles. The articles report, among other things, that Bildman’s counsel denied all the allegations asserted against Bildman. Several articles allegedly quoted Bildman’s counsel. Bildman himself did not speak to the media at this time.
On May 8, 1996, plaintiff filed this action. In June of 1996, Astra terminated Bildman for cause.
DISCUSSION
Summaiy judgment shall be granted where there are no genuine issues as to any material fact in dispute and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and mandates summaiy judgment in favor of the moving party. Kourouvacilis v. General Motor Corp., 410 Mass. 706, 711 (1991), citing Celotex v. Catrett, 477 U.S. 317, 322 (1986).
A. The Contract Claim.
In order to prevail on her contract claim, plaintiff must prove that “there was a valid contract [supported by consideration], that the defendants] breached [their] duties under [the] contractual agreement, and that the breach caused [plaintiff] damage.” Gluckenberger v. Boston University, 974 F.Sup. 106, 150 (D.Mass. 1997); Singarella v. City of Boston, 342 Mass. 385, 387 (1961).
Plaintiff alleges that defendants breached the Confidentiality provision of the Agreement with various statements made to the media and to individuals outside Astra. Specifically, plaintiff claims that (1) defendants published the details of the June 14, 1995 incident to Business Week; (2) Bildman allegedly told Astra employees that ”[t]here is no case” and that plaintiffs claim had been settled; (3) Yon disclosed settlement of plaintiffs claim to Zenker, the media advisor, and informed him about the confidentialily provision; (4) Bildman, through counsel, issued general denials of the sexual harassment allegations; (5) Thomas Rohanna, an Astra employee, informed Bradford Waite, plaintiffs former boyfriend, of the dispute between plaintiff and Astra; and (6) Astra made various statements to newspapers regarding the alleged sexual harassment problems at Astra. Each of these claims will be addressed in turn.
1. Communications between the media and defendants
a. Business Week Article — "Abuse of Power"
Maremont investigated allegations of widespread sexual harassment at Astra over a period of several months. There is no dispute that he learned during his investigation about the underlying allegations of plaintiffs claim. There is also no dispute that he had discussions with individuals at Astra regarding his investigation immediately before publication of his cover stray.
Plaintiff contends that several passages in Maremont’s article prove that defendants breached the Agreement because she is mentioned and her allegations against Bildman are outlined. Plaintiff asserts that because she did not speak to Maremont about her employment at Astra, it must have been defendants who leaked plaintiffs allegations to Mare-mont. I disagree.
The fact that statements in the Business Week article are attributed to defendants does not prove plaintiffs claims. In the first place, the Business Week article alone cannot be used to prove that defendants actually made such statements. Fitzgerald v. Town of Kingston, 13 F.Sup.2d 119, 123 (D.Mass. 1998), citing Horta v. Sullivan, 4 F.3d 2, 8 (1st. Cir. 1993) (copy of newspaper article insufficient to establish that defendant made certain statements). Secondly, in his affidavit, Maremont states that, after January 5, 1996, no information in the first two paragraphs of his article came from Astra or Bildman.[6] Third, plaintiff and her counsel concede that they do not know who spoke to Maremont about plaintiff. Deposition of Pamela L. Zortman, May 14, 1997, p. 34-37; Deposition of Philip Giordano, July 23, 1997, p. 86.
Despite Maremont’s affidavit and plaintiffs concession, plaintiff attempts to support her allegations by contending that during a meeting between Maremont and Astra on April 22, 1996, Astra specifically discussed plaintiffs claim. As evidence, plaintiff relies upon the transcript of the meeting. That transcript reveals, however, that plaintiff was not mentioned by name and that Astra officials stated that they would not discuss specific claims.
Nevertheless, plaintiff contends that at one point during the meeting an Astra official specifically referred to plaintiff in the following way:
Another claim alleging that Mr. Goldman had fondled someone in the presence of the sales force — we conducted an investigation with outside counsel, two outside counsel, myself, Lynn — we spoke to eveiy Astra employee that we could identify that was present at the meeting, eveiy hotel employee and other vendor that was present and no one saw *80 anything inappropriate or anything that corroborated the claim . . .
Plaintiff makes more of this passage than is actually there by strategically inserting her name in certain places in order to imply that the Astra official was speaking about her. It is, however, unclear whether this passage refers to plaintiff. In fact, after the meeting, Maremont, in a follow-up letter to Astra on April 24, 1996, stated that it was not clear if Astra was referring to plaintiff when they made that statement.
Because plaintiff has not shown that defendants spoke to Maremont about her, she lacks any actionable claim for breach of contract based upon the first two paragraphs of the Business Week article.
Plaintiff next claims that Astra breached the Agreement by three specific statements which appeared in the Business Week article. In the first statement, Maremont reports that “[Astra] has paid cash sums ranging from $20,000 to about $100,000 to five women that Business Week knows of. In return, those women agreed to keep silent.”
Plaintiffs argument appears to be that since plaintiff did not speak to Maremont and plaintiff was the only woman to receive a $100,000 settlement, defendants must have provided this information to Mare-mont in breach of the Agreement. However, despite the extensive discovery which has occurred in this case, plaintiff has provided no evidence that defendants were the source of this statement, nor that plaintiff was the only woman to receive $100,000 from Astra in connection with the matters which were the subject of the Business Week article.
Plaintiff next alleges that Astra breached the Agreement when Yon, Astra’s general counsel, told Mare-mont that “[plaintiff and others were] fired for poor performance” and that “the claims were baseless.” Plaintiff asserts that there was a further breach when, as reported by Maremont, “Yon paraded out a host of mostly low-level female staffers . . . [who] flatly contradicted . . . [the sexual harassment allegations and] appeared to be part of a much broader strategy to discredit . . . those [including plaintiff] who’ve raised allegations of harassment.”
Nothing in the summary judgment record supports plaintiffs assertion that the quoted passages were about her. Plaintiff misleads the court by implying that these passages specifically referred to her when, in fact, the passages do not mention her name at all.[7] Thus, the breach of contract claim based upon these quoted passages fails.[8]
b. Astra’s alleged Statements to Newspapers
Plaintiff next alleges that several statements purportedly made by Astra, and in particular Astra spokesperson Benjamin Kincannon, to several newspapers breached the Agreement.[9]
These statements include:
1. Boston Globe — April 30, 1996 — "Kincannon said sexual harassment has not been a big problem for [Astra]. ‘There have never been any criminal charges, never any findings of probable cause, and never any judgment against [Astra] and no violations of federal law.’ “
2. Boston Globe — May 1, 1996 — "Astra officials were forthcoming about the number of claims brought by employees . . . Astra’s Kincannon gave a full accounting of past and pending employee claims and how they were handled... In addition to formal complaints, Kincannon said [Astra] has faced ‘eight threatened sexual harassment claims’ in the past fifteen years."
3. Boston Herald — May 4, 1996 — "Astra allegedly paid former employees as much as $100,000 to avoid lawsuits . . . Yet while Astra has spoken openly about allegations of sexual harassment. .."
4. Boston Globe — May 7, 1996 — "The buzz continued yesterday among employees of [Astra] who learned the lurid details of the charges spelled out in the press accounts last week . . . More than a dozen complaints were brought against the company internally or formally, the company said. Astra settled a number of them at unknown cost, the firm and former workers said."
Plaintiff has no breach of contract claim against Astra based upon these statements. The mere fact that Kincannon is quoted in a newspaper article or that statements are attributed to Astra does not prove in and of itself that the statements were made by or on behalf of Astra. See Fitzgerald v. Town of Kingston, 13 F.Sup.2d at 123 (newspaper article is inadmissible hearsay and thus meaningless on a summary judgment motion). Plaintiff must show with admissible evidence who made these statements before Astra may be held liable.[10] Even if plaintiff could prove that Astra made these statements, the statements do not mention plaintiff or even remotely refer to her, her underlying claim or the “fact of and terms of the Agreement.”[11] Therefore, they are not actionable.
c. Bildman’s statements to Business Week and the News Media
Plaintiff alleges that several statements made by Bildman’s personal counsel breached the Agreement, thereby making Bildman and Astra liable. These statements include:
1 .BusinessWeek — May 2, 1996 — "On May 1, 1996, as the article was going to press, Bildman categorically denied the allegations in a written statement."
2. Boston Globe — May 3, 1996 — "Bildman, through his attorney, denied all charges of sexual harassment. ‘It’s not true,’ said Boston attorney Roderick MacLeish, Jr. . . . According to MacLeish, Bildman was accused by employees in two separate incidents of‘flirting’ and of‘dancing too close.’ However, the first complaint, lodged internally at Astra, was *81 settled in 1994, he said. The second was settled in 1995 after the company obtained more than 100 affidavits saying the allegations against his client were not true, he said. The settlements were made “without any admission of liability.’ “
3. Wail Street Journal — May 3, 1996 — "In addition, three former or present female employees of Astra have made sexual harassment complaints about Mr. Bildman since 1992 and two of them have received settlements from the company, according to Mr. Bildman’s attorney, Roderick MacLeish, Jr. Mr. MacLeish called the harassment complaints ‘baseless’ and denied any misuse of company funds by his client . . . Mr. MacLeish said former Astra employees have sought monetary damages on such allegations as that the chief executive got drunk at a company party and danced uncomfortably close to her. Another complaint, made in 1994 and settled by the company, involved a woman who said Mr. Bildman ‘flirted’ with her. Mr. MacLeish said both complaints were unfounded."
4. Boston Herald — May 4, 1996 — "Astra also allegedly paid former employees as much as $100,000 to avoid lawsuits . . . Yet while Astra has spoken openly about the allegations of harassment . . . Bildman, a Brookline resident, could not be reached for comment, but his lawyers said he completely denies all the allegations. ‘He didn’t engage in any sexual harassment whatsoever,’ said Treaz-ure Johnson of Eckert, Seamans, Cherin & Mellott of Boston."
5. Boston Herald — May 7, 1996 — "Bildman, through his attorney, has said the allegations are false."
6. Boston Globe — May 7, 1996 — "Bildman has denied the charges."
Plaintiff alleges that defendants breached the Agreement when Bildman through counsel issued general denials of the sexual harassment allegations. Plaintiff contends that the Confidentiality provision of the Agreement prevented Bildman from denying her claim. Bildman argues that despite the Confidentiality provision he always retained the right to deny plaintiffs allegations and that the general denials comply with the Non-Admissions provision[12] of the Agreement.
Bildman also argues that any statements made by an Eckert Seamans attorney are absolutely privileged and thus any claim based upon such statements is barred. Astra contends that it is not liable to plaintiff for these statements because these statements were made by Bildman’s personal counsel who lacked authority to bind Astra.
(i) Liability of Bildman
It is settled law that interpretation of a contract is a question of law for the court. Lexington Insurance Co. v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995). “A contract is to be construed to give reasonable effect to each of its provisions,” Sarvis v. Cooper, 40 Mass.App.Ct. 471, 475 (1996), quoting McMahon v. Monarch Life Insurance Co., 345 Mass. 261, 264 (1962). An unambiguous contract will be enforced according to its terms. Schwanbeck v. Federal-Mogul Co., 412 Mass. 703, 706 (1992). When interpreting a contract, ‘‘every phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable, when construed with all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties.” Sarvis v. Cooper, 40 Mass.App.Ct. at 475-76 (citations omitted).
Here, the Confidentiality provision of the Agreement expressly prohibits the parties from disclosing the “fact of and the terms and conditions of this Agreement.” (Emphasis added.) Another provision entitled Non-Admissions provided that Bildman, among others, expressly denied any and all liability to plaintiff. By the express language of the Confidentiality provision, Bildman was prohibited from denying the allegations as that was a term and condition of the Agreement. To accept Bildman’s argument that he had the right to continue denying plaintiffs allegations under the Non-Admissions provision of the Agreement would in effect nullify the Confidentiality and the Mutual Nondisparagement[13] provisions. Such an interpretation would be contrary to established principles that “a contract should be construed in such a way that no word or phrase is made meaningless by interpreting another word or phrase." Lexington Insurance Co. v. All Regions Chemical Labs, Inc., 419 Mass. at 713. In addition, if Bildman retained the right to deny the allegations, plaintiff would logically retain the right to assert the allegations. Such a result would obviously erode the Agreement.
Accordingly, I rule that Bildman was expressly prohibited from commenting on or denying plaintiffs allegations after January 5, 1996. Thus, any such statement made by Bildman to that effect would constitute breach of the Agreement.
Bildman next argues that because the statements in question were issued by Eckert Seamans, his counsel, they are absolutely privileged and may not form the basis of any claim. “Under Massachusetts law, an attorney’s statements are absolutely privileged “where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation.’ ” Blanchette v. Cataldo, 734 F.2d 869, 877 (1st. Cir. 1984), quoting Striberg v. Raymond, 370 Mass. 105, 109 (1976). This privilege applies as a general bar to all civil liability based upon an attorney’s statements. Sullivan v. Birmingham, 11 Mass.App.Ct. 359, 367 (1981); Blanchette v. Cataldo, 734 F.2d at 877.
*82 However, for the privilege to apply, the statements must be “pertinent to the proceedings,” a requirement which is broadly construed. Sullivan v. Birmingham, 11 Mass.App.Ct. at 362. In other words, the statements “must have some reference to the subject matter of the proposed or pending litigation, although it need not be strictly relevant to any issue involved in it . . . Such a broad standard of relevancy protects the integrity of the adversarial system, while still providing some limitation on malicious conduct.” Leavitt v. Bickerton, 855 F.Sup. 455, 456-57 (D.Mass. 1994). Underlying the privilege is the “public policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients . . ." Striberg v. Raymond, 370 Mass. at 108.
Here, Eckert Seamans issued several statements to the media denying that Bildman engaged in any misconduct. Under the applicable standard for establishing privilege, the statements must be “relevant or pertinent” to a judicial proceeding. See Sullivan v. Birmingham, 11 Mass.App.Ct. at 362 (privilege available only when the challenged remarks are relevant or pertinent to a judicial proceedings); see also Hoar v. Wood, 44 Mass. 193, 197 (1841) (for privilege to apply, words spoken must be in course of judicial proceeding and be relevant and pertinent to the subject of inquiry).
On the record before me, Bildman has not established that at the time the statements were made, a judicial “proceeding [was] contemplated in good faith and [was] under serious consideration” by Bildman or against him. See Smith v. Suburban Restaurants, Inc., 374 Mass. 528, 531 (1978); Axton-Cross Co., Inc. v. Blanchette, Civ. No. 94-2764H (Middlesex Super. Ct. Oct. 17, 1994) (Lauriat, J.), 2 Mass. L. Rptr. No. 32, 646, 648 (1994). Although lawsuits were ultimately filed against Bildman (including plaintiffs), Bildman has not shown that he knew at the time Eckert Seamans’ denials were made that these lawsuits were under serious consideration.[14]
Therefore, while facts may be established at trial which demonstrate that the privilege does apply, at this stage I cannot rule as a matter of law that the statements are privileged. Smith v. Suburban Restaurants, Inc., 374 Mass. at 531-32. 
(ii) Liability of Astra
On April 28, 1996, Astra suspended Bildman with pay and appointed an interim president and CEO in his place. Astra notified Bildman at that time that he was “suspended with pay immediately from [his] positions as President, Chief Executive Officer and Director of the Company . . . [that he would] not be allowed access to any of the premises of the Company... [that] all other employees have or will be instructed not to communicate with [Bildman] . . . [and that he was to] return all property of Astra.” Astra also informed Bildman that he might want to obtain his own counsel. Astra argues that upon Bildman’s suspension on April 28, 1996, he was stripped of all authority to act on behalf of Astra, and thus any statements made by Bildman’s counsel after that date do not bind Astra. Plaintiff, however, argues that since Bildman was still an employee of Astra on April 28, 1998, he and his counsel had authority to bind Astra.
Under Massachusetts law, “[a] principal may manifest his termination of his agent’s authority, either in whole or in part, by conduct that is inconsistent with its continuance . . . Any form of manifestation made known to the agent is effective if reasonably interpreted, it indicates that the principal no longer consents to have the agent act for him.” Gagnon v. Coombs, 39 Mass.App.Ct. 144, 151, quoting Restatement (Second) of Agency, §119 comment a (internal quotes omitted). “Whatever the original agreement or authority may have been ... if the agent knows facts which should lead him to believe his authority is restricted or terminated, [the agent] has a duty to act only within the limits of the situation as it is currently known to him.” Id., quoting Restatement (Second) of Agency, §33 comment a. A principal’s revocation must be communicated to the agent. Restatement (Second) of Agency, §119.
Based upon these principles, as a matter of law Astra’s actions effectively stripped Bildman of his actual authority to act on Astra’s behalf, and the suspension letter plainly informed Bildman of the revocation of his authority. Accordingly, I find and rule that, as of April 28, 1996, Bildman lacked actual authority to bind Astra.
As stated above, Bildman retained Eckert, Seamans as his personal counsel. At that time, Bildman’s interests were adverse to Astra, because Astra was contemplating Bildman’s termination. Thus, as a matter of law, Astra cannot be held liable for Bildman’s counsel’s statements based upon a theory of actual authority. See Gagnon v. Coombs, 39 Mass.App.Ct. at 151.
Plaintiff also argues that Astra is liable for Eckert Seamans’ denials because Bildman had apparent authority to bind Astra. Under Massachusetts law, apparent authority is created when “written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.” Weisman v. Saetz, 11 Mass.App.Ct. 440, 442 (1981), quoting Restatement (Second) of Agency §27; DeVaux v. American Home Assurance Co., 387 Mass. 814, 819 (1983). Termination of actual authority does not necessarily terminate an agent’s apparent authority. Restatement (Second) of Agency, §124A. Apparent authority terminates only when the third person has notice of the termination or notice that the principal no longer wishes the agent to act on his behalf. Restatement (Second) of Agency §125.
*83 On April 29, 1996, Astra issued a press release detailing Bildman’s suspension. The suspension was reported in the Globe and the Wall Street Journal on April 30, 1996. Plaintiff herself read about Bildman’s suspension in the Globe on April 30, 1996. She concedes that when she read the statements purportedly made by Bildman’s counsel, she was aware that Eckert, Seamans was speaking on behalf of Bildman and not Astra. Deposition of Pamela L. Zortman, June 27, 1997, p. 56-57, 60-61.
Plaintiff provides no evidence to support her argument that Bildman had apparent authority to bind Astra other than her assertion that since Bildman was still an employee of Astra he had authority to bind Astra. To prevail under a theory of apparent authority, plaintiff must prove that she believed Bildman had authority to bind Astra and that that belief was reasonable. Weisman v. Saetz, 11 Mass.App.Ct. at 442. Because plaintiff provides no evidence that she actually believed Bildman had authority to act on Astra’s behalf after April 26, I find and rule that plaintiff has not shown that Bildman had apparent authority to bind Astra after his suspension.
Accordingly, Astra is not liable to plaintiff based upon statements made by Bildman or his personal counsel after the date of Bildman’s suspension.
2.Bildman’s statements to Astra Employees
When asked by other employees about plaintiffs claim, Bildman responded, "There is no case” and, according to plaintiff, said that plaintiffs claim had been settled. Plaintiff contends that these statements breached the Agreement. Defendants contend that Bildman’s statement “there is no case” falls squarely within the Response to Inquiries[15] provision of the Agreement. Defendants also argue that Bildman never informed anyone that plaintiffs claim had been settled.
Paragraph 8 of the Agreement, entitled Response to Inquiries, provides in pertinent part: “Zortman and Astra and all those named in paragraph 3 above agree that in response to any inquiry regarding the status of her dispute with Astra and all those named in paragraph 3 above, Zortman and Astra will state only that no claim or action has been filed by Zortman . . .” According to its plain and ordinary language, under this provision the parties were prohibited from discussing their dispute except to state that plaintiff had not filed any claim or action. Bildman’s response, “there is no case,” comes within the mandate of the Response to Inquiries provision. To conclude otherwise would be to ignore the plain language of the provision and result in a nonsensical and unreasonable interpretation. See Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 701 (1964); New England Foundation Co. v. Commonwealth, 327 Mass. 587, 596 (1951).
Nothing in the record supports plaintiffs assertion that Bildman himself told Astra employees that the case had been settled. At this stage of the litigation, plaintiff cannot rest on the mere allegations of .her complaint; she must come forward with specific evidence.[16] Thus, I rule as a matter of law that plaintiff has no breach of contract claim against Bildman or Astra based upon Bildman’s statement “there is no case,” or the alleged statement that the dispute with plaintiff had settled.
3.Yon’s Disclosures to Zenker
Plaintiff next alleges that during meetings to prepare for Astra’s response to Maremont, Astra discussed plaintiff with its media advisors in contravention of the Agreement. As support, plaintiff relies upon Arnold Zenker’s[17] notes of meetings with Astra as evidence of what was discussed at the meetings. However, plaintiff is referred to only once in Zenker’s notes, a notation made on December 22, 1995 before any confidentiality obligation. Thus, no claim exists based upon that disclosure.
Plaintiff also alleges that Astra breached the Agreement when Yon disclosed to Zenker that Astra had settled the dispute with plaintiff and that the Agreement contained a Confidentialiiy provision. Astra does not dispute that Yon disclosed the settlement to Zen-ker. Rather, Astra contends that disclosure to Zenker was necessary because Zenker needed to know how to deal with plaintiffs claim when addressing the media.
The Confidentiality provision of the Agreement provides: “Astra... agrees to keep confidential the fact of and terms and conditions of this Agreement and Release and not disclose them to any person except that Astra may disclose the fact of and terms of this Agreement to its legal, tax and auditor advisors . . .” (emphasis added). Under this language, Astra was prohibited from disclosing the terms of the Agreement to anyone except three enumerated groups: its legal, tax and auditor advisors. Because the Agreement did not allow disclosure to media advisors, Astra potentially breached the Agreement when Yon disclosed the settlement and Agreement to Zenker.
A question of fact arises, however, as to when Yon made this disclosure. It is not clear from the record whether the disclosure occurred before or after execution ofthe Agreement on January 5,1996. If disclosure occurred before the Agreement’s execution, there is no breach. Because a question of material fact exists on this issue, I deny summary judgment as to Astra’s alleged breach of contract based upon its disclosure of the settlement to Zenker.
4.Thomas Rohanna’s discussions with Bradford Waite
Plaintiff next alleges that Astra breached the Agreement when a “company attorney” directed an Astra sales representative, Thomas Rohanna, to contact Bradford Waite, plaintiffs former boyfriend and Rohanna’s high school friend, to discuss plaintiffs claim against Astra. There is no dispute that Waite and *84 plaintiff dated briefly during the early months of 1996 and that Rohanna and Waite spoke by telephone during that time.[18] The evidence does not demonstrate, as plaintiff alleges, that Rohanna was directed by an Astra official to contact Waite. Rohanna stated that he was never directed by an Astra supervisor, official or attorney to contact Waite. Waite stated that Rohanna had told him that a “company attorney” might be contacting him. Deposition of Bradford Waite, September 19, 1997, p. 103. Thus, plaintiffs breach of contract claim fails on this point.
B. Tort Claims
Plaintiff alleges several tort claims against defendants based upon many of the same statements and actions upon which she bases her breach of contract claims. At the outset, I rule that plaintiff has no actionable tort claim based upon the Business Week article and the statements in the newspapers attributed to Astra. Plaintiff cannot prove (1) that defendants provided Business Week with the details of her claim or (2) that Astra actually made the statements which appeared in the newspapers.[19]
1.Invasion of Privacy and Defamation
Plaintiff alleges that defendants defamed her and invaded her privacy by the various statements made by Eckert Seamans.
General Laws c. 214, §1B provides in pertinent part that: “[a] person shall have a right against unreasonable, substantial or serious interference with his privacy.” “The notion of right of privacy is founded on the idea that an individual may hold close certain manuscripts, private letters, family photographs, or private conduct which is no business to the public and the publicizing of which is, therefore, offensive.” Cefalu v. Globe Newspaper Co., 8 Mass.App.Ct. 71, 77 (1979). To prevail on a claim of invasion of privacy, plaintiff must prove that defendants’ actions were unreasonable and that their conduct amounted to a substantial or serious interference with her privacy. Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514, 517-18 (1991).
“The elements of a defamation claim include (1) a false and defamatory communication (2) of and concerning the plaintiff which is (3) published or shown to a third party.” Dorn v. Astra USA, 975 F.Sup. 388, 396 (D.Mass. 1997), citing McAvoy v. Shufrin, 401 Mass. 593, 597 (1988). In order to recover, plaintiff must prove that defendant[s’] words were “of and concerning" plaintiff, by demonstrating “either that the defendants] intended [their] words to refer to plaintiff and that they were so understood, or that the defendants’] words reasonably would be interpreted to refer to plaintff and that the defendants] were negligent in publishing them in such a way that they could be so understood.” New England Tractor-Trailer Training of Connecticut, Inc. v. Globe Newspaper Co., 395 Mass. 471, 483 (1985).
Plaintiff has no actionable claims on these theories because the statements she complains about did not refer to her nor did they disclose any private facts about plaintiff. Additionally, because plaintiffs allegations had already been publicized in the Business Week article at the time Eckert Seamans issued statements, Bildman cannot be liable for invasion of privacy for purportedly giving further publicity to the issues. See Jones v. Taibbi, 400 Mass. 786, 801 (1987).
Additionally, plaintiff fails to prove that the statements were “of and concerning” her. “If the person is not referred to by name or in such manner as to be readily identifiable from the descriptive matter in the publication, extrinsic facts must be alleged and proved showing that a third person other than the person libeled understood it to refer to him.” Brauer v. Globe Newspaper Co., 351 Mass. 53, 56 (1966). No evidence in the summary judgment record demonstrates that the statements were understood by third parties to refer to plaintiff. See Dorn v. Astra USA, 975 F.Sup. at 396 (“furthermore, [Eckert Seaman’s] denial of wrongdoing in the face of the Business Week Article does not constitute a claim of defamation. In light of the fact that [plaintiff was] neither named nor described in the article [and newspapers], . . . the statements in that context were not specifically ’of and concerning’ [plaintiff] and thus were not particularly harmful to the reputation of [plaintiff]”).
Accordingly, I rule as a matter of law that plaintiffs claims for invasion of privacy and defamation fail.
2.Intentional Interference with Advantageous Relations
To establish a claim for intentional interference with advantageous relations, plaintiff must allege and prove “(1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendants’ knowledge of the contract or business relationship; (3) the defendants’ intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages.” Swanset Development Corp. v. Taunton, 423 Mass. 390, 397 (1996), citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812, 815-17 (1990).
Plaintiff alleges that defendants’ statements and actions made her unemployable in the pharmaceutical industry, thus making Astra and Bildman liable to her for intentional interference with advantageous relations. Since nothing in the record before me demonstrates that plaintiff had a business relationship or a contract of economic benefit with a third party or that defendants had any knowledge of such a relationship, summary judgment is allowed on this claim.
3.Emotional Distress Claims
Plaintiff claims that defendants inflicted negligent and intentional infliction of emotional distress based upon their purported publication of her claim, their *85 statements made to the media and Astra’s purported instruction to Rohanna to contact Waite to discredit plaintiff.
To establish a claim for intentional infliction of emotional distress, plaintiff must prove “(1) that the defendants] intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of [their] conduct, (2) that the defendants’] conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendants] were the cause of [plaintiffs] distress and (4) the emotional distress suffered by [plaintiff] was severe and of such a nature that no reasonable person could be expected to endure it.” Tetrault v. Mahoney, Hawkes & Golding, 425 Mass. 456, 466 (1997), quoting Payton v. Abbott Labs, 386 Mass. 540, 555 (1982). To recover on a claim for negligent infliction of emotional distress, plaintiff must prove “(1) negligence: (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatol-ogy; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.” Payton v. Abbott Labs, 386 Mass. at 557. In order to satisfy the physical harm requirement, plaintiff must allege and prove more than “mere upset, dismay, humiliation, grief and anger... Rather [plaintiff] must corroborate [her] mental distress claims with enough objective evidence of harm . . .” Sullivan v. Boston Gas Co., 414 Mass. 129, 137 138 (1993).
Based upon the above principles, plaintiffs claims for both intentional and negligent infliction of emotional distress fail as a matter of law. Plaintiff has not proven that Astra directed Rohanna, a sales representative, to contact plaintiffs former boyfriend to discredit her. Waite testified that Rohanna told him that a company attorney might contact him, Rohanna stated in his affidavit that he was never directed by Astra to contact Waite.
I also find as a matter of law that none of the statements and conduct rise to the level of “extreme and outrageous, beyond all possible bounds of decency, nor utterly intolerable in civilized society.” Ziemba v. Fo’cs’le, Inc. 19 Mass.App.Ct. 484, 489 (1985). Nor has plaintiff demonstrated that her “emotional distress was severe or of a nature that no reasonable person could be expected to endure it.” Id. Plaintiff alleges no more than “upset, dismay and humiliation” which is not enough for an emotional distress claim. Sullivan v. Boston Gas Co., 414 Mass. at 137-38.
ORDER
For the foregoing reasons, the Court hereby ORDERS that:
1. Plaintiffs motion for summary judgment is DENIED;
2. Defendant Astra USA’s motion for summary judgment and Defendant Lars Bildman’s motion for summary judgment is DENIED only as to so much of Count I of the First Amended Complaint as alleges breach of contract based upon (1) statements made by Bildman’s personal counsel to the news media; (2) Bildman’s denials of plaintiffs sexual harassment claims after January 5, 1996; and (3) Astra’s general counsel's disclosure of plaintiffs settlement to Arnold Zenker. Defendants’ motions for summary judgment are otherwise ALLOWED as to the contract claim and ALLOWED as to the claims for invasion of privacy (Count II), tortious interference with advantageous and contractual relations (Count III), defamation (Count IV), intentional infliction of emotional distress (Count V) and negligent infliction of emotional distress (Count VI).

 Before her resignation, plaintiff told at least 10 Astra employees and her immediate family about the alleged dinner dance incident.

 Paragraph 3 provided in pertinent part: “Zortman . . . releases Astra, its Board of Directors (including individual Board members personally and in their official capacities), its officers, employees, (including Lars Bildman and Robin Manthe personally and in their official capacities), and all related or affiliated entitles from any and all charges . . .”

 A question of fact exists as to when Yon informed Zenker of the settlement, specifically whether it was before or after the Agreement had been executed. Yon testified at his deposition that he could not recall the date on which he disclosed the settlement to Zenker. Deposition of Charles Yon, September 11, 1998, p. 71, 74-75. However, later in his deposition, Yon stated that he did not discuss the fact of the settlement with Zenker after the Agreement had been executed. Deposition of Charles Yon, p. 151. Conversely, Zenker testified at his deposition that he believed Yon informed him of the settlement after January 5, 1996, the date of the Agreement. Deposition of Arnold Zenker, May 14, 1998, p. 68-69.

 Astra terminated Bildman in June 1996.

 Plaintiff can only prevail on her breach of contract claims with proof of statements made on or after January 5, 1996, the date the parties executed theAgreement. Before that date, the parties had no obligation to keep plaintiffs sexual harassment claim confidential.

 In addition to implying that the quote referred to her, plaintiff suggests that Yon stated that all employees who asserted claims had been fired for poor performance and that all the claims were baseless. That is not what Maremont reported. Rather, Maremont wrote: “Astra says there have been only a few settlements and that the majority of claims came from people fired for poor performance. Though it says most of the claims were baseless, it insists the settlements were made primarily to avoid litigation.” (Emphasis added.) The other passage that plaintiff incorrectly quotes actually states: ”[a]t the initial interview with Business Week, Yon paraded out a host of mostly low-level female representatives and two outside public-relations executives, who flatly contradicted those told to Business Week by numerous independent sources.”

 To the extent that plaintiff alleges a claim against Bild-man based upon these three statements, that claim fails for the same reasons.

 Plainüff also claims that Astra is liable for several statements made by Bildman’s attorney which allegedly breached *86 the Agreement. These statements are be discussed infra at 19.

 Plamtiff acknowledged that she did not consider any statements purportedly made by Astra which did not mention her name to be a breach of the Agreement. Deposition of Pamela L. Zortman, June 26, 1997, p. 100.

 Plaintiff also contends that Bildman is liable for these particular statements. For the same reasons, she is wrong.

 This provision is quoted at page 3 of this decision.

 The Mutual Nondisparagement provision provided that the parties would not say anything false, disparaging or negative about the other. This provision is set forth at page 4 of the decision.

 On May 9, 1996, the Boston Herald reported that Roderick MacLeish said: “She got $100,000 for a dancing-too-close case and now she’s asking for more? We are going to fight this all the way. They are trying to exploit the situation. It’s disgusting. It’s a disgrace. This is an example of why there are too many lawyers in America . . . MacLeish said his firm has gathered 100 statements from witnesses who dispute Zortman’s version of the dancing incident.” This statement is privileged because it was made during the course of litigation. Eckert Seamans was responding to the complaint filed the previous day by plaintiff. See Striberg v. Raymond, 370 Mass. at 108.

 This provision is set forth at page 4 of this decision.

 Bildman states that he did not inform anyone about the settlement with plaintiff or the Agreement. Deposition of Lars Bildman, April 30, 1998, p. 49.

 In December 1995, Astra hired Arnold Zenker as a media advisor.

 A dispute exists as to the extent of the communications between Rohanna and Waite. Rohanna states that Waite already knew the details of plaintiffs sexual harassment claim at the time of their conversation. Waite testified that while he knew generally that plaintiff had a problem with her employer, Rohanna told him the details of plaintiffs claim. Deposition of Bradford Waite, September 19, 1997, p. 55-56, 105.

 With regard to the statements purportedly made to the newspapers between April 30, 1996 and May 8,1996, plaintiff concedes that she did not experience emotional distress as a result of any article about Astra which did not contain her name. Deposition of Pamela L. Zortman, June 26, 1997 p. 77. It is undisputed that plaintiff was not named in any of the newspaper articles.